Electronically Filed
Supreme Court
SCWC-16-0000604
30-JUN-2020
08:24 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

STATE OF HAWAI‘I,
Respondent/Plaintiff-Appellee,

vs.

MICHAEL GLENN,
Petitioner/Defendant-Appellant.

SCWC-16-0000604

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000604; 1PC14-1-000921)

JUNE 30, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.  INTRODUCTION

In order to commit a crime, a defendant must be capable of intending to act wrongfully.  The bedrock principle that a crime requires a wrongful intent "is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal

individual to choose between good and evil." Morissette v.
United States, 342 U.S. 246, 250 (1952). For this reason, if a
mental illness or impairment results in a defendant lacking
substantial capacity to appreciate the wrongfulness of their
conduct or to conform their conduct to the law, then the
defendant cannot be held criminally responsible. Hawai'i Revised
Statutes (HRS) § 704-400 (2019).[1] When, after a mental
evaluation, an examiner opines that the defendant lacked penal
responsibility, HRS § 704-408 (2019)[2] provides that the court
"shall" instruct the jury on the penal-responsibility defense.

---

[1] HRS § 704-400 provides:

(1) A person is not responsible, under this Code,
for conduct if at the time of the conduct as a result
of physical or mental disease, disorder, or defect
the person lacks substantial capacity either to
appreciate the wrongfulness of the person's conduct
or to conform the person's conduct to the
requirements of law.

(2) As used in this chapter, the terms "physical or
mental disease, disorder, or defect" do not include
an abnormality manifested only by repeated penal or
otherwise anti-social conduct.

[2] HRS § 704-408 provides:

If the report of the examiners filed pursuant
to section 704-404, or the report of examiners of the
defendant's choice under section 704-409, states that
the defendant at the time of the conduct alleged was
affected by a physical or mental disease, disorder,
or defect that substantially impaired the defendant's
capacity to appreciate the wrongfulness of the
defendant's conduct or to conform the defendant's
conduct to the requirements of law, the court shall
submit the defense of physical or mental disease,
disorder, or defect to the jury or the trier of fact
at the trial of the charge against the defendant.

We are now asked to interpret and define the safeguards embedded in this defense.

This case arises from a confrontation between Michael Glenn (Glenn) and the Complaining Witness (CW), which escalated when Glenn allegedly began threatening to strike CW with a baseball bat. Glenn was arrested and charged with one count of Terroristic Threatening in the First Degree.

Early in the proceedings, the Circuit Court of the First Circuit (circuit court) ordered evaluations on Glenn's mental health. Two of the three examiners concluded that Glenn was unfit to proceed and that he lacked penal responsibility. However, Glenn told his examiners that he did not believe he was mentally ill and that he did not want to assert a defense based on lack of penal responsibility. After further evaluations and hearings, the circuit court found Glenn was fit to stand trial, despite mixed conclusions by his examiners. Rather than raise lack of penal responsibility as a defense, Glenn asserted a theory of self-defense at trial, but was found guilty.

Glenn now argues that the circuit court should have either sua sponte instructed the jury about the defense of lack of penal responsibility, or conducted a colloquy to ensure that Glenn knowingly and voluntarily decided not to raise the defense. The Intermediate Court of Appeals (ICA) affirmed

Glenn's conviction, holding that HRS § 704-408 must be read in pari materia with HRS 704-402 and 701-115 and that consequently, "HRS section 704-408 should be interpreted as requiring the trial court to instruct the jury or to obtain a waiver on the insanity defense only when the jury was presented with evidence [supporting the defendant's lack of penal responsibility]." We agree with the ICA that the trial court was under no duty to sua sponte instruct the jury under the circumstances of this case; however, we disagree that courts have no duty to obtain a knowing, intelligent, and voluntary waiver of a penal-responsibility defense.

Lack of penal responsibility is not merely a statutory affirmative defense; it reflects a precept that is fundamental to due process under the Hawaiʻi Constitution: "A defendant who, due to mental illness, lacks sufficient mental capacity to be held morally responsible for his actions cannot be found guilty of a crime." Kahler v. Kansas, 140 S. Ct. 1021, 1039 (2020) (Breyer, J., dissenting). Accordingly, we prospectively hold that once the court receives notice, pursuant to HRS § 704-407.5(1),[3] that a defendant's penal responsibility is an issue in

---

[3] HRS § 704-407.5(1) provides:

Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding penal responsibility, or there is reason to believe that

(continued)

4

the case, the circuit court must advise a defendant of the penal-responsibility defense and obtain a knowing waiver of the defense. Cf. Tachibana v. State, 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995). However, because we adopt the colloquy requirement prospectively, and insufficient evidence was presented at trial to require a jury instruction on whether Glenn lacked penal responsibility, we affirm Glenn's conviction and the judgment of the ICA.

## II. BACKGROUND

### A. Pre-Trial Proceedings[4]

On June 5, 2014, the State charged Glenn with one count of Terroristic Threatening in the First Degree, in violation of HRS § 707-716(1)(e) (Supp. 2013).[5] Shortly thereafter, Glenn's defense counsel filed a "Motion for the Appointment of Examiners to Determine Defendant's Fitness to Proceed and Penal Responsibility," notifying the court that

---

the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may order an examination as to the defendant's physical or mental disease, disorder, or defect at the time of the conduct alleged.

[4] The Honorable Richard K. Perkins presided.

[5] "A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening: . . . [w]ith the use of a dangerous instrument[.]" HRS § 707-716(1)(e). Terroristic threatening is defined as "threaten[ing], by word or conduct, to cause bodily injury to another person . . . or to commit a felony: (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]" HRS § 707-715 (Supp. 2013).

"there exists a reasonable basis to question Defendant's current fitness to proceed and penal responsibility during the time in question." The State did not object to the appointment of examiners. The circuit court granted the motion, appointing a panel of three mental health professionals to evaluate Glenn and staying the proceedings until the evaluations could be completed.

### 1. The Examiners' Reports

In their initial evaluations, two of the three examiners found Glenn unfit to proceed and opined that he lacked penal responsibility at the time of the offense.

Leonard Jacobs, M.D. (Dr. Jacobs), concluded that at the time of Glenn's alleged offense, as well as at the time of his evaluation, Glenn suffered from a major mental illness and was not receiving treatment. Because Glenn's "capacity to appreciate the wrongfulness of his conduct and [] conform his conduct to the requirements of the law was substantially impaired by his mental disorder at the time of his alleged actions[,]" Dr. Jacobs concluded that Glenn was not penally responsible.

Like Dr. Jacobs, Tom Cunningham, Ph.D. (Dr. Cunningham), concluded that Glenn was unfit to proceed and lacked penal responsibility. Dr. Cunningham opined that Glenn's

"cognitive and possibly volitional capacity was most likely substantially impaired by mental disorder" at the time of the alleged offense. Additionally, Dr. Cunningham concluded that although Glenn was able to understand the proceedings against him, his ability to "assist in his own defense and consult with an attorney rationally was substantially impaired."

The third evaluator, Marvin Acklin, Ph.D. (Dr. Acklin), concluded that Glenn "appeared" fit to proceed and penally responsible. Dr. Acklin explained that at the time of the evaluation, Glenn "appear[ed] to be cognitively and psychiatrically intact" with no psychiatric diagnosis. And he noted that Glenn did not believe he was mentally ill at the time of the offense, and that he did "not understand the necessity, nor . . . intend to utilize, a mental defense." Furthermore, Dr. Acklin noted that during his evaluation, Glenn "demonstrated a rational understanding of his circumstances, [and noted] that he [was] not pursuing a mental health defense because of [its] consequences," which included the risks of having it on his record and future stigma. Nothing suggested to Dr. Acklin that "Mr. Glenn's cognitive and volitional capacities [at the time of the alleged offense] were substantially impaired" by mental illness. Accordingly, Dr. Acklin concluded that Glenn likely was penally responsible.

### 2. October 2014 Fitness Hearing

At the first fitness hearing in October 2014, Glenn's counsel stipulated to the examiners' reports but informed the court, "[Glenn] did, however, want me to place on the record that he does not agree that he is not fit to proceed. So I agreed to do that on his behalf." Nevertheless, in light of Dr. Jacobs' and Dr. Cunningham's findings, the circuit court determined that Glenn was not fit to proceed. The circuit court then committed Glenn "to the custody of the Director of [the Department of] Health for detention, care[,] and treatment" and placed Glenn at the Hawai'i State Hospital (HSH).

### 3. January 2015 Reevaluation Hearing

After about three months of treatment, HSH requested Glenn's reevaluation. At the hearing for reevaluation, defense counsel again explained that Glenn did not believe he had any mental health issues. However, counsel deferred to the court as to whether to order a reevaluation. The circuit court ordered another round of examinations, but only to evaluate Glenn's fitness.

### 4. Reevaluations of Glenn's Fitness

Dr. Jacobs and Dr. Cunningham's re-evaluations were substantially similar to their initial assessments. And, although not specifically requested to do so, Dr. Cunningham

continued to express reservations about Glenn's penal responsibility: "I fear that if Mr. Glenn is found fit[,] he will receive a punishment for a serious offense for which he lacked cognitive capacity."

After the second evaluation, Dr. Acklin changed his diagnosis of Glenn from "none" to "indeterminate." Dr. Acklin also noted that "a diagnosis of malingering is ruled out since [Glenn] denies mental health problems." Nevertheless, Dr. Acklin concluded that there was "no reason that Mr. Glenn [was] not fit to proceed," although he explained that this conclusion was not the same as an opinion based on positive findings.

### 5. June 2015 Fitness Hearing

Following the reevaluations, at the June 2015 fitness hearing, defense counsel asked the court to find Glenn fit to proceed, or in the alternative, to order another round of evaluations after a shorter period of treatment. The circuit court determined that Glenn was still unfit, but in light of the defense's request, decided the court would reassess in three months' time.

### 6. September 2015 Report from the Hawai'i State Hospital

Prior to the September fitness hearing, Glenn's HSH treatment team updated the circuit court on Glenn's mental health treatment. HSH concluded that Glenn "has the capacity to

work with his attorney in his defense, knows his charge, his available pleas, the possible penalties if found guilty, the roles of various courtroom personnel, and can maintain proper court decorum." Accordingly, HSH opined, "Mr. Glenn is not in need of [hospital-level] care or treatment."

At the subsequent fitness hearing, on Glenn's request, the circuit court found him fit to proceed and set a trial date.

B.    **Trial**[6]

The following evidence was adduced at Glenn's jury trial in March 2016.

On the night of May 27, 2014, CW and his cousin were walking towards Foodland at the Windward City Shopping Center in Kāneʻohe. As they were walking, CW almost bumped into Glenn. CW testified that although he heard Glenn mutter something under his breath, he kept walking. CW then heard Glenn call him a "fat boy."

According to CW, when he turned around, Glenn pointed at CW with his hand shaped like a gun and told CW that he was going to shoot him. CW and Glenn both recalled that "the N-word" was used during the encounter, but each claimed that the other had said it. CW's cousin testified that although he did not remember exactly what was said, CW "wasn't name calling, but

_____

[6]    The Honorable Rom A. Trader presided.

the defendant had been calling him fat boy and all that stuff." According to CW, Glenn told him to take his Bob Marley shirt off, and CW did, ready to "scrap." Glenn then removed a baseball bat from one of his bags, raised it above his shoulder, and began approaching CW. Glenn whacked the bat on the ground a few times, hard enough that it may have caused a chip in the pavement.

After witnessing the altercation between Glenn and CW, a Foodland manager called the police, but by the time they arrived, Glenn had left the scene. Glenn was arrested shortly thereafter.

Testifying on his own behalf, Glenn explained that he took his bat out to protect himself and to de-escalate the situation, not to hurt CW. He admitted that he called CW a "fat boy," but explained that he only confronted CW because he thought he had heard CW call him a dog and "the N-word." Glenn told the jury that he had come to Hawai'i in 2012, in order to "fulfill [his] odyssey and [his] expectations, you know, kind of like the great expectations." He explained that he was a "master mason," and that, in order to "fulfill [his] degrees within [his] guild, [he had to] go and plant seeds or [] lay squares, what we call 'lay squares.'" He also explained that on the night in question, he was at Starbucks, "doing some work,

networking," because he was also a "practicing amateur physicist . . . working on anatomic nuclei[.]" Glenn stayed at Starbucks until about 10 p.m., when he decided to go to McDonald's to "burn the midnight oil" and "work[] on [his] equations and theor[e]ms" in his lab.

None of the examiners who had evaluated Glenn's penal responsibility testified at trial.

## C. Jury Instructions and Verdict

Per the defense's request, the circuit court instructed the jury to consider whether Glenn had been acting in self-defense. However, the defense neither proposed an instruction for lack of penal responsibility nor objected to its omission in the court's finalized instructions. The circuit court did not discuss the possibility of such an instruction with Glenn or instruct the jury about lack of penal responsibility sua sponte.

After deliberations, the jury found Glenn guilty of Terroristic Threatening in the First Degree. The circuit court sentenced him to five years of imprisonment.

## D. ICA Summary Disposition Order

In his appeal to the ICA, Glenn argued that "(1) the [c]ircuit [c]ourt erred in its failure to either secure from him a waiver of the insanity defense or to sua sponte require the

jury to consider it, and (2) there was insufficient evidence to support his conviction."

The ICA affirmed Glenn's conviction in a summary disposition order (SDO). The ICA first explained that despite HRS § 704-408's language that "the court shall submit the defense of physical or mental disease, disorder, or defect to the jury or the trier of fact at the trial of the charge against the defendant," the text had to be read in pari materia with HRS §§ 704-402 (lack of penal responsibility is an affirmative defense) and 701-115 (instructing that "[n]o defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented").

Thus, when read in pari materia, the ICA interpreted HRS § 704-408 as

> requiring the trial court to instruct the jury or to
> obtain a waiver on the insanity defense only when the
> jury was presented with evidence indicating that the
> defendant was affected by a physical or mental
> disease, disorder, or defect that substantially
> impaired the defendant's capacity to appreciate the
> wrongfulness of the defendant's conduct or to conform
> the defendant's conduct to the requirements of law.

Since no evidence supporting a penal-responsibility defense was presented to the jury, the ICA concluded that the circuit court was not required to obtain a waiver from Glenn or to sua sponte instruct the jury to consider whether Glenn lacked penal responsibility. Moreover, the ICA concluded that "[e]ven

13

if the Circuit Court submitted the insanity defense to the jury, there was no context for the jury to consider it."

The ICA also found that Glenn's conviction was supported by substantial evidence, and accordingly, affirmed his conviction.  Glenn filed a timely application for writ of certiorari.

### III.  STANDARDS OF REVIEW

#### A.  Constitutional Law

"We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case.  Thus, we review questions of constitutional law under the right/wrong standard."  State v. Ui, 142 Hawai'i 287, 292, 418 P.3d 628, 633 (2018) (quoting State v. Friedman, 93 Hawai'i 63, 67, 996 P.2d 268, 272 (2000)).

#### B.  Statutory Interpretation

The interpretation of a statute is a question of law that this court reviews de novo.  State v. Arceo, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996).

> [O]ur foremost obligation is to ascertain and give
> effect to the intention of the legislature, which is
> to be obtained primarily from the language contained
> in the statute itself.  And we must read statutory
> language in the context of the entire statute and
> construe it in a manner consistent with its purpose.

State v. Ruggiero, 114 Hawai'i 227, 231, 160 P.3d 703, 707 (2007) (quoting Gray v. Admin. Dir. of the Court, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)).

## C. Jury Instructions

This court may notice the omission of an unrequested jury instruction as plain error if it appears that "the defendant has come forward with credible evidence going to the defense that the jury should have been able to consider . . . and it would serve the ends of justice and prevent the denial of fundamental rights to address such an omission." State v. Taylor, 130 Hawai'i 196, 207-08, 307 P.3d 1142, 1153-54 (2013) (footnote and internal quotation marks omitted) (quoting State v. Kikuta, 125 Hawai'i 78, 95, 253 P.3d 639, 656 (2011)).

## IV. DISCUSSION

## A. A Defendant Has a Fundamental Right Under the Hawai'i Constitution to Assert Lack of Penal Responsibility as a Defense

"The due process guarantee of the Hawai'i Constitution serves to protect the right of an accused in a criminal case to a fundamentally fair trial, and central to the protections of due process is the right to be accorded a meaningful opportunity to present a complete defense." State v. Matsumoto, 145 Hawai'i 313, 328, 452 P.3d 310, 325 (2019) (quotation marks omitted). Inherent in the promise of due process is the fundamental

15

principle that a defendant who, due to mental illness, lacks the capacity to conform their conduct to the law, or understand that their conduct was wrongful, cannot be held criminally responsible. See Kahler, 140 S. Ct. at 1038 (Breyer, J. dissenting). As the California Supreme Court recognized, "the suggestion that a defendant whose mental illness results in inability to appreciate that his act is wrongful could be punished by [] imprisonment raises serious questions of constitutional dimension under both the due process and cruel and unusual punishment provisions of the Constitution." People v. Skinner, 704 P.2d 752, 757 (Cal. 1985) (citing, inter alia, Leland v. Oregon, 343 U.S. 790 (1952) and People v. Coleman, 126 P.2d 349 (Cal. 1942)). After all, the purposes of punishment are not served by holding a person responsible for conduct they did not know was wrong or could not control. See 21 Am. Jur. 2d Criminal Law § 45 ("[A] basic postulate of criminal law is a free agent presented with a choice between right and wrong and choosing freely to do wrong[;] an insane person is not punishable because he or she is outside this postulate, and is incapable of knowing right from wrong.").

We acknowledge that the United States Supreme Court has reached a different conclusion with respect to the due process clause in the federal constitution. Kahler, 140 S. Ct.

at 1025.  However, "[w]e have long recognized . . . that 'as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader protection under the Hawai'i Constitution than that given by the federal constitution.'"  State v. Viglielmo, 105 Hawai'i 197, 210–11, 95 P.3d 952, 965–66 (2004) (quoting State v. Arceo, 84 Hawai'i at 28, 928 P.2d at 870 (1996)).  Thus, "in Hawaii due process protection under our state constitution is not necessarily limited to that provided by the fourteenth amendment of the United States Constitution."  State v. Bernades, 71 Haw. 485, 487, 795 P.2d 842, 843 (1990).

Other states have similarly recognized that under their state constitutions, due process prohibits the conviction of a defendant who, due to mental illness or infirmity, could not understand the wrongfulness of their conduct.  E.g., State ex rel. Causey, 363 So.2d 472, 473–74 (La. 1978); Finger v. State, 27 P.3d 66, 68 (Nev. 2001); Sinclair v. State, 132 So. 581, 582 (Miss. 1931) (per curiam).  Indeed, as early as 1910, the Supreme Court of Washington recognized that the defendant had a fundamental right under the state constitution to offer evidence that they were "unable to comprehend the nature and quality of the act committed":

> [T]he sanity of the accused at the time of committing the act charged against him has always been regarded as much a substantive fact, going to make up his

> guilt, as the fact of his physical commission of the act. It seems to us the law could as well exclude proof of any other substantive fact going to show his guilt or innocence. If he was insane at the time to the extent that he could not comprehend the nature and quality of the act - in other words, if he had no will to control the physical act of his physical body - how can it in truth be said that the act was his act? To take from the accused the opportunity to offer evidence tending to prove this fact is in our opinion as much a violation of his constitutional right of trial by jury as to take from him the right to offer evidence before the jury tending to show that he did not physically commit the act or physically set in motion a train of events resulting in the act.

State v. Strasburg, 110 P. 1020, 1021, 1024 (Wash. 1910).

"In determining which rights are fundamental, we must look 'to the traditions and collective conscience of our people to determine whether a principle is so rooted there . . . as to be ranked as fundamental.'" State v. Mallan, 86 Hawai'i 440, 443, 950 P.2d 178, 181 (1998) (quoting Baehr v. Lewin, 74 Haw. 530, 556, 852 P.2d 44, 57 (1993)) (alterations omitted). And in this context, "[h]istorical practice overwhelmingly supports the conclusion that legal insanity is a fundamental principle." Finger, 27 P.3d at 80.

"The idea that the insane should not be punished for otherwise criminal acts has been firmly entrenched in the law for at least one thousand years." Jonas Robitscher & Andrew Ky Haynes, In Defense of the Insanity Defense, 31 Emory L.J. 9, 10 (1982). In Anglo-American jurisprudence, the legal principle that in order to commit a crime, a person must be "capable of

perceiving the wrongful character of his act," can be traced back to scholars in the 13th Century. <u>Kahler</u>, 140 S. Ct. at 1040 (Breyer, J. dissenting) (citing 2 <u>Bracton On Laws and Customs of England</u> 384 (S. Thorne transl. 1968)).

In 1843, these theories culminated in the legal definition of insanity by the English House of Lords in <u>M'Naghten's Case</u>, "the most famous statement of the traditional insanity defense[.]" <u>Kahler</u>, 140 S. Ct. at 1038 (Breyer, J., dissenting). The <u>M'Naghten</u> rule set forth a two-prong test that focused on a defendant's cognitive capacity to appreciate the wrongfulness of their conduct:

> [T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, [1] as not to know the nature and quality of the act he was doing; or, [2] if he did know it, that he did not know he was doing what was wrong.

<u>M'Naghten's Case</u>, 8 Eng. Rep. 718, 722 (H. L. 1843).

By the time of the founding of the United States, the principle of legal insanity was well-established in the common law: "Judges regularly instructed juries that the defendant's criminal liability depended on his capacity for moral responsibility." <u>Kahler</u>, 140 S. Ct. at 1043 (Breyer, J., dissenting) (collecting cases demonstrating "the prevailing view of the law around the time of the founding"). After <u>M'Naghten's Case</u> was decided in the mid-Nineteenth century, American courts

19

widely adopted the rule, with some variations, maintaining it throughout the Nineteenth into the Twentieth Century. Kahler, 140 S. Ct. at 1045 (Breyer, J. dissenting) ("Variations on the M'Naghten rules soon became the predominant standard in the existing states of the United States."); see, e.g., Commonwealth v. Rogers, 48 Mass. 500, 501-02 (1844) ("A man is not to be excused from responsibility, if he has capacity and reason sufficient to enable him to distinguish between right and wrong[.]"). "[T]his long legal tradition. . . reflects the fact that a community's moral code informs its criminal law." Kahler, 140 S. Ct. at 1047 (Breyer, J. dissenting).

The legal tradition that penal responsibility should track moral culpability also has a long tradition in Hawai'i. In 1850, the House of Nobles and Representatives of the Kingdom of Hawai'i adopted a variation of the M'Naghten rule as part of the new, written penal code.[7] Penal Code of the Hawaiian Islands

---

[7] The Penal Code of 1850 provided in relevant part:

> Any person acting under mental derangement, rendering him incompetent to discern the nature and criminality of an act done by him, shall not be subject to punishment therefore: Provided, however, that if any such person, while capable of discerning the nature and criminality of any act, entertained the intent to do the same, and subsequently does it in pursuance and execution of such intent, he shall be held responsible therefor, though the same be done in such state of mental derangement[.]

(continued)

20

June 21, 1850, ch. IV, § 4.  That provision remained in force for over a century.

In 1862, King Kamehameha IV signed an act establishing insane asylums and, among other things, permitting courts to commit to a mental hospital "[a]ny person indicted for any crime who shall be acquitted by reason of insanity or mental derangement."  An Act to Establish an Insane Asylum, § 5, Appendix to Compiled Laws of the Hawaiian Kingdom 1884 at 507-08.  In the Penal Code of 1869 and through the remaining years of the Hawaiian Kingdom, the law on penal responsibility remained the same, preventing the conviction of anyone unable to "discern the nature and criminality of [their] act[.]"  Penal Code of the Hawaiian Kingdom 1869, ch. IV, § 4; see also In re

---

Penal Code of the Hawaiian Islands June 21, 1850, ch. IV, § 4, available at http://www.llmc.com/OpenAccess/docDisplay5.aspx?textid=33160589 (last visited June 26, 2020).

In Hawaiian, this provision read:

O ka mea pupule maoli a me ka mea ike ole i kea no o kana hana ana, aole ia e hoopaiia; aka hoi, ina i manao maopopo kekahi e hana i kekahi hewa i kona wa pupule ole, a mahope hooko maoli oia mamuli o kona manao kolohe i kona wa pupule, alaila e hoopaiia no ia no kela hewa; a pela no, ina loaa ia ia ka pupule no kona inu rama a no kekahi hewa e ae paha, e hoopaiia no ia.

He Kanawai Hoopai Karaima No Ko Hawaii Pae Aina June 21, 1850 [The Penal Code of the Hawaiian Islands June 21, 1850], mokuna [chapter] IV, § 4, available at http://www.llmc.com/OpenAccess/docDisplay5.aspx?textid=33160863 (last visited June 26, 2020).
    We have recognized that this language created a rule "similar to the rule of criminal responsibility as established by the M'Naghten case."  State v. Moeller, 50 Haw. 110, 114, 433 P.2d 136, 140 (1967); see also Territory v. Alcosiba, 36 Haw. 231, 239 (Haw. Terr. 1942).

21

The Mary Belle Roberts, 3 Haw. 823, 828 (Haw. Kingdom 1877) (recognizing that insanity relieves a person of responsibility for a crime). Following the overthrow of the Hawaiian Kingdom in 1893, the Republic of Hawai'i maintained the same rule of penal responsibility taken in its entirety from the 1869 penal code of the Kingdom of Hawai'i. Penal Code of the Hawaiian Islands 1897, ch. 4, § 24.

Thus, by the time the United States annexed Hawai'i in 1898 and established a territorial government in 1900, Hawai'i had recognized for fifty years that a person who was incapable of understanding "the nature and criminality of an act done" was "not [to] be subject to punishment." See Penal Code of the Hawaiian Islands June 21, 1850, ch. IV, § 4; Penal Code of the Hawaiian Islands 1897, ch. 4, § 24. The law on penal responsibility remained the same for the duration of Hawai'i's territorial government and into its first two decades of statehood. See Organic Act of April 30, 1900, ch. 339, 31 Stat. 141; Revised Laws of Hawai'i (RLH) §203-3670 (1915); RLH § 249-4 (1955). And the insanity defense seems to have been in regular, if not frequent, use during that time. See, e.g., Territory v. Lum Dim, 23 Haw. 792, 794–95 (Haw. Terr. 1917); Territory v. Fukunaga, 30 Haw. 697, 735 (Haw. Terr. 1929); Territory v. Alcosiba, 36 Haw. 231, 238 (Haw. Terr. 1942); Territory v.

22

Adiarte, 37 Haw. 463, 466 (Haw. Terr. 1947); State v. Foster, 44 Haw. 403, 428–29, 354 P.2d 960, 973 (1960).

In 1967, the Hawaiʻi Supreme Court observed that the law on penal responsibility "has been in our statute books without change since the compilation of the Penal Code of 1850 by Chief Justice Lee." State v. Moeller, 50 Haw. 110, 115, 433 P.2d 136, 140 (1967). And we recognized that "[b]oth Section 249-4 [codifying the insanity defense] and the M'Naghten rule hold that a person is criminally responsible for his act if he understands the nature of the act and knew that the act was wrong." Id. at 114, 433 P.2d at 140. Further, we clarified that the inability to distinguish between right and wrong is, by itself, a basis for a finding of insanity:

> [A] defendant is to be deemed insane and not criminally responsible if he is found to be suffering from a mental derangement and (1) he is incompetent to understand the nature of the act committed, or (2) if he understood the nature of the act but he was unable to distinguish between right and wrong in relation to the act.

Id. at 115, 433 P.2d at 140 (holding that the test is not whether the defendant understood the nature of the act and could distinguish between right and wrong) (emphasis added).

In 1972, the Hawaiʻi legislature enacted HRS § 704-400, when it adopted a new penal code "modeled in great part after the Model Penal Code." See State v. Nuetzel, 61 Haw. 531, 537–38, 606 P.2d 920, 925 (1980). As we recognized in Nuetzel, the

23

legislature intended HRS § 704-400 to modernize the insanity defense by providing that (1) "either the volitional or cognitive aspects of an individual's processes may be impaired" and (2) "substantial incapacity," rather than total incapacity, was sufficient to establish lack of penal responsibility.  Id. at 542, 606 P.2d at 927.  Thus, while the language of the rule changed, the basic principle that a person is not criminally responsible if they cannot appreciate the wrongfulness of their conduct remained constant: "A person is not responsible . . . [if] as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law."  HRS § 704-400(1).  As a result, when the Constitutional Convention of 1978 reconsidered the text and meaning of the due process clause in Hawai'i's Constitution, it did so after over a century of consistent recognition, despite four different forms of government, that the ability to distinguish right from wrong was essential to criminal responsibility.

In the summer of 1978, delegates gathered to debate and consider proposals to amend the state constitution, which had been drafted in 1950, before statehood.  1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at vii-viii

(1980). Notably, among the various proposed amendments was the abolition of the insanity defense, which after its introduction by Delegate Tam, was sent to the Committee on the Bill of Rights for review. Id. at 491. The Committee voted down the proposal. Id. The issue was brought to the floor during the last days of the convention, at which point the delegates considered sending a request asking the legislature to review the insanity defense in order to prevent abuse of the system by individuals who did not, in fact, merit the defense. Id. at 494.

It is striking that delegates on both sides of the issue agreed that the insanity defense provided crucial protection to individuals who did not merit punishment, with Delegate DiBianco, who opposed the resolution, noting "[t]here are people who have mental disorders such that they are not criminally responsible," and, as Delegate Tam explained, "[t]his is not to say consideration shouldn't be given where it is deserved." Id. at 493-94. Thus, even as the convention discussed asking the legislature to consider the defense, there was no suggestion that persons should be held criminally responsible, regardless of their ability to appreciate the wrongfulness of their conduct - only that there should be a way to minimize abuse of the defense by those who "in no way qualify for any type of consideration." Id. at 494. In other words,

the concern was "not so much with the defense itself as with the administration of it." Id. at 496. Accordingly, at the end of the convention, when the delegates submitted their proposed amendment to the due process clause of the Hawai'i Constitution[8] to the electorate – which subsequently approved it - they preserved the ability to raise a penal-responsibility defense for defendants who suffered from mental illness to such an extent that they should not be held criminally responsible.

In sum, the lengthy history and tradition of the insanity defense shows that lack of penal responsibility is a deeply rooted concept, not only in Anglo-American law, but also in Hawai'i. This fundamental premise of criminal liability has remained consistent from the time of the Hawaiian monarchy until today, and it was against this backdrop that the electorate adopted the existing due process clause in our state constitution. Consequently, we have no hesitation in concluding that due process prevents criminal punishment of defendants who, "as a result of physical or mental disease, disorder, or defect . . . lack[] substantial capacity either to appreciate

---

[8]   The delegates ultimately decided not to change the substance of the due process clause and recommended only a minor change in order to make it gender neutral, changing "No person shall be deprived of life, liberty or property without due process of law, . . . nor be denied the enjoyment of his civil rights" to "No person shall be deprived of life, liberty or property without due process of law, . . . nor be denied the enjoyment of the person's civil rights[.]"  1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 831, 1149 (1980) (emphases added).

26

the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law."

It is against this backdrop, then, that we turn to Glenn's first question presented – whether a trial court must conduct a colloquy with the defendant regarding the penal-responsibility defense.

**B.    We Adopt a Prospective Rule that, if a Trial Court Receives Notice that Lack of Penal Responsibility May Be a Defense, the Court Must Obtain a Knowing and Voluntary Waiver of the Defendant's Right to Assert the Defense**

We have long recognized the vital importance of ensuring that defendants know and understand their rights before waiving them.  After all, "basic values of personal dignity and fairness are enhanced when the defendant is presented with an opportunity to choose among relevant alternatives."  Tachibana, 79 Hawai'i at 235, 900 P.2d at 1302 (quoting United States v. Martinez, 883 F.2d 750, 766-67 (9th Cir. 1989) (Reinhardt, J., dissenting)).  Moreover, "defendants are often unaware that they have certain constitutional rights that may not be waived by their counsel or that they must object to waiver by counsel at trial."  State v. Murray, 116 Hawai'i 3, 13, 169 P.3d 955, 965 (2007) (citing Tachibana, 79 Hawai'i at 234, 900 P.2d at 1301).

This court has repeatedly found that a colloquy between the trial court and defendant is the best way to ensure that a defendant's rights are protected.  Id. at 12, 169 P.3d at

964. Colloquies "promote[] judicial efficiency by establishing on the record that the defendant has voluntarily waived [his rights.]" Id. For that reason, we require trial courts to engage in on-the-record colloquies with criminal defendants to ensure the knowing, intelligent, and voluntary waiver of numerous trial rights. See, e.g., State v. Vaitogi, 59 Haw. 592, 601, 585 P.2d 1259, 1265 (1978) (guilty plea); State v. Ibuos, 75 Hawaiʻi 118, 121, 857 P.2d 576, 578 (1993) (trial by jury); Tachibana, 79 Hawaiʻi at 235–36, 900 P.2d at 1300–01 (right to testify); Murray, 116 Hawaiʻi at 21, 169 P.3d at 973 (right to have each element proven to a jury beyond a reasonable doubt); State v. Hernandez, 143 Hawaiʻi 501, 515, 431 P.3d 1274, 1288 (2018) (plea of no-contest). Since the decision to assert the defense of lack of penal responsibility raises similarly weighty due process considerations, we impose such a requirement prospectively here.

The penal-responsibility defense "stands in stark contrast from all [] other affirmative defenses." Treece v. State, 547 A.2d 1054, 1060 (Md. 1988). While other defenses may negate a defendant's criminal liability, lack of penal responsibility eliminates a defendant's moral culpability as well. Moreover, unlike other affirmative defenses, a defendant who prevails on the penal-responsibility defense does not simply

28

walk free – the determination of irresponsibility becomes part of the defendant's record, HRS § 704-402(3), and can result in the defendant's commitment to an appropriate institution or supervision through conditional release, HRS § 704-411.  Given the significant consequences that can result, from a practical standpoint, a determination of lack of penal responsibility is more akin to a guilty plea than an affirmative defense.  Treece, 547 A.2d at 1060; see also 21 Am. Jur. 2d Criminal Law § 55 (2019) ("[W]hile insanity is an affirmative defense in many states, the decision to raise the defense is akin to a plea decision, and as such, the decision rests with the defendant alone.").  Thus, the nature of the penal-responsibility defense and its resemblance to a guilty plea makes a colloquy necessary to preserve the fundamental fairness of a trial.[9]

We are not alone in adopting this colloquy requirement.  Numerous other jurisdictions have imposed colloquy requirements when doubt arises as to a defendant's penal responsibility:

> [W]henever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to [ensure] that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the

---

[9]  Because the penal-responsibility defense is different from other statutory defenses that are not required as a matter of due process, our holding should not be read as requiring a colloquy for every plausible affirmative defense.

> defense, and freely chooses to raise or waive the
> defense.

Frendak v. United States, 408 A.2d 364, 380 (D.C. 1979); see also People v. Gettings, 530 N.E.2d 647, 650 (Ill. App. 1988); Jacobs v. Commonwealth, 870 S.W.2d 412, 418 (Ky. 1994), overruled on other grounds by St. Clair v. Commonwealth, 451 S.W.3d 597 (Ky. 2014); Treece, 547 A.2d at 1063; State v. Gorthy, 145 A.3d 146, 157 (N.J. 2016); City of Bismarck v. Nassif, 449 N.W.2d 789, 798 (N.D. 1989); State v. Brown, 890 A.2d 79, 91 (Vt. 2005); State v. Jones, 664 P.2d 1216, 1221 (Wash. 1983); Farrell v. People, 54 V.I. 600, 615 (2011). Cf. Hendricks v. People, 10 P.3d 1231, 1243 (Colo. 2000) (holding statutory rule requires an inquiry into a defendant's decision not to plead insanity). But see State v. Peterson, 689 P.2d 985, 991 (Or. Ct. App. 1984) (holding that trial court did not need to inquire whether a defendant, who was both competent and represented by counsel, had voluntarily and intelligently chosen to forgo a defense based on lack of penal responsibility); State v. Francis, 701 N.W.2d 632, 640, 640 n.5 (Wis. Ct. App. 2005) (holding that defendant's counsel could withdraw a plea based on lack of penal responsibility without requiring the court to personally address defendant, but nevertheless advising that to do so was best practice).

In Frendak, the first case to impose a colloquy requirement on this issue, the District of Columbia Court of Appeals explained that when a defendant chooses not to raise an insanity defense, the defendant "relinquishes important safeguards intended to protect persons who are not legally responsible for their acts from punishment and culpability in the eyes of society." Frendak, 408 A.2d at 378. While "there are persuasive reasons why defendants convicted of an offense may choose to accept the jury's verdict rather than raise a potentially successful insanity defense," in order to ensure that the defendant relinquishes those safeguards knowingly, intelligently, and voluntarily, the court held that "a trial judge must seek the same type of assurance when a defendant chooses to reject an insanity defense" as when a defendant pleads guilty or chooses to waive the right to counsel. Id. at 376, 378.

Since Frendak, which has been widely followed, many states have drawn similar comparisons between the waiver of an insanity defense and waiver of other rights. See, e.g., Treece, 547 A.2d at 1063 ("The decision to forego a not criminally responsible plea requires the same ability to choose between various alternatives as does the decision to plead guilty, to elect to proceed without counsel, or to waive a jury trial.");

31

Jones, 664 P.2d at 1221 ("As with waiver of all rights, waiver of an NGI plea must satisfy certain conditions in order to be constitutionally valid."); Brown, 890 A.2d at 90 (explaining that waiver of the right to present an insanity defense "was de facto a waiver of the essential right in a criminal trial to present a defense").

Thus, we join these other states in adopting the reasoning of Frendak and hold prospectively that a trial court has a duty to advise a defendant about the penal-responsibility defense and to ensure that a defendant knowingly, intelligently and voluntarily chooses to waive the defense.

The trial court has the "ultimate obligation to promote justice in criminal cases." State v. Haanio, 94 Hawai'i 405, 414, 16 P.3d 246, 255 (2001), overruled on other grounds by State v. Flores, 131 Hawai'i 43, 314 P.3d 120 (2013). While a defendant may have sound reasons for choosing not to assert such a defense, a court does not "promote justice" by convicting a defendant of an offense for which he or she lacked penal responsibility, if the decision to forgo that defense was "based on ignorance or incomprehension." Treece, 547 A.2d at 1063.

We now turn to the practical considerations for a penal-responsibility colloquy. First, a colloquy is required if defense counsel files a notice that the defendant "inten[ds] to

rely on the defense of physical or mental disease, disorder, or defect excluding penal responsibility, or [if] there is reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case[.]"  HRS § 704-407.5(1); see also Phenis v. United States, 909 A.2d 138, 155 (D.C. 2006) (holding a colloquy is required when there is "a substantial question of the defendant's sanity at the time of the crime" (quoting Briggs v. United States, 525 A.2d 583, 592 (D.C. 1987)).

Second, the colloquy should take place no later than the court's pre-trial Tachibana advisement.[10]  See State v. Lewis, 94 Hawai'i 292, 297, 12 P.3d 1233, 1238 (2000).  This will give the defendant an opportunity to consider their options prior to the commencement of trial, without overly interfering in the relationship between the defendant and defense counsel.[11]

---

[10]    If a defendant decides to plead guilty after defense counsel triggered the colloquy requirement by filing a notice under HRS § 704-407.5(1), a discussion about the penal-responsibility defense may also be necessary as part of the plea colloquy in order to ensure the defendant's guilty plea was made knowingly, intelligently, and voluntarily.

[11]    The trial court is free to advise a defendant about the penal-responsibility defense as soon as practicable to afford a defendant time to discuss their options with counsel and, if they so choose, to prepare the defense before trial.  Cf. Lewis, 94 Hawai'i at 297, 12 P.3d at 1238.  For example, in this case, the circuit court could have given an advisement at the September 2015 hearing, when the court found Glenn fit to proceed and set a trial date.

Third, with respect to the content of the advisement, we adopt the approach recently taken by the New Jersey Supreme Court:

> The court should explain to the defendant the nature and purpose of the defense. It should generally describe the evidence relevant to that defense, including expert opinion that could be used to support or counter that defense. The court should inform the defendant of his or her sentencing exposure in the event of a conviction. It should describe [] commitment and the other potential dispositions that are prescribed by [HRS § 704-411] in the event of an acquittal by reason of insanity. The court should confirm the defendant's understanding of the insanity defense as it may affect the outcome of the trial, defendant's risk of incarceration and the prospect of civil commitment.

Gorthy, 145 A.3d at 157.

At the conclusion of the advisement, the trial court should make a finding on the record whether the defendant's decision to not rely on the penal responsibility defense was knowing, intelligent, and voluntary.

We emphasize that, as with a Tachibana colloquy, the court's only inquiry should be whether the defendant's decision to waive lack of penal responsibility as a defense is knowing, intelligent and voluntary – not whether it is wise. Valid reasons certainly exist for choosing to reject a viable penal-responsibility defense, not the least of which is the prospect of commitment to an institution. See Frendak, 408 A.2d at 376-77. Therefore, the trial court must respect the decision of a competent defendant who is represented by counsel. Treece, 547

34

A.2d at 1062 ("The decision is one for the defendant to make, after proper consultation with counsel, just as a competent defendant must, ultimately, decide the wisdom of self-representation or of a plea of guilty."); United States v. Marble, 940 F.2d 1543, 1547 (D.C. Cir. 1991) ("[A] district court must allow a competent defendant to accept responsibility for a crime committed when he may have been suffering from a mental disease."). Thus, the colloquy given should be in terms of the defendant's rights and available alternatives, and the potential ramifications of the defendant's decision. See Gorthy, 145 A.3d at 157.

Finally, in adopting this colloquy requirement we exercise this court's supervisory powers "to adopt [a] new procedural requirement[] to prevent error in the trial courts." State v. Cabagbag, 127 Hawai'i 302, 315, 277 P.3d 1027, 1040 (2012). Therefore, this rule applies prospectively to cases in which trial commences after the date of this decision. See Tachibana, 79 Hawai'i at 238, 900 P.2d at 1305. "[I]n all other cases, post-conviction evidentiary hearings will be required to resolve claims" that a defendant did not knowingly and voluntarily waive lack of penal responsibility as a defense. Id.

Here, as the trial court followed the rules in place at the time of Glenn's trial, and as there is nothing in the current record on appeal indicating that Glenn sought or wanted to raise a penal-responsibility defense, we do not find that his due process rights were infringed.

**C.   A Circuit Court Does Not Have a Duty to Sua Sponte Instruct the Jury About Lack of Penal Responsibility When There is Insufficient Evidence Presented at Trial to Support the Defense**

Glenn also argues that the circuit court erred by failing to sua sponte instruct the jury on the defense of lack of penal responsibility.[12]  He asserts that HRS § 704-408 requires a circuit court to so instruct the jury whenever an examiner concludes that a defendant lacked penal responsibility. We disagree.  We hold that the court did not have a duty to sua sponte instruct the jury about lack of penal responsibility because notwithstanding the examiners' reports, there was insufficient evidence presented at trial from which a jury could conclude that Glenn lacked penal responsibility.

HRS § 704-408 provides:

> If the report of the examiners filed pursuant to
> [HRS] section 704-404, or the report of examiners of
> the defendant's choice under [HRS] section 704-409,
> states that the defendant at the time of the conduct

---

[12]    We recognize that this issue is unlikely to be implicated in the future, since a trial court must respect the decision of a competent defendant made after a colloquy.  However, because we adopt the colloquy requirement prospectively, this issue may impact cases, like Glenn's, in which the trial court did not conduct a colloquy.  Accordingly, we choose to address it.

alleged was affected by a physical or mental disease, disorder, or defect that substantially impaired the defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law, the court <u>shall</u> submit the defense of physical or mental disease, disorder, or defect to the jury or the trier of fact at the trial of the charge against the defendant.

(Emphasis added).

Glenn argues that the word "shall" in HRS § 704-408 means that "a pretrial determination of penal irresponsibility automatically triggers a mandatory trial action by the court to submit the defense." Because two of the three examiners who evaluated him concluded that he lacked penal responsibility at the time of the offense, he asserts that the circuit court was obligated to instruct the jury about the defense. However, the ICA correctly concluded that the circuit court did not have such a duty because HRS § 704-408 must be read alongside HRS § 704-402 (2019)[13] and HRS § 701-115 (2019).[14]

---

[13]    HRS § 704-402 provides in relevant part: "Physical or mental disease, disorder, or defect excluding responsibility is an affirmative defense."

[14]    HRS § 701-115 provides in relevant part:

(2)    No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented. If such evidence is presented, then:
. . . .
      (b)    If the defense is an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability.

"It is a canon of construction that statutes that are in pari materia may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject."  State v. Kamana'o, 118 Hawai'i 210, 218, 188 P.3d 724, 732 (2008).  HRS § 1-16 codifies this rule, providing "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another."  Thus, HRS § 704-408 must be interpreted in the context of Section 704 and the Hawai'i Penal Code as a whole.

As the ICA recognized, HRS § 704-402 establishes that lack of penal responsibility is an affirmative defense.  And HRS § 701-115, which governs defenses generally, establishes that "[n]o defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented." Indeed, "[t]he defendant claiming lack of penal responsibility 'has the burden of going forward with the evidence to prove facts constituting the defense and of proving such facts by a preponderance of the evidence.'"  State v. Uyesugi, 100 Hawai'i 442, 456, 60 P.3d 843, 857 (2002) (quoting State v. Fukusaku, 85 Hawai'i 462, 481, 946 P.2d 32, 51 (1997)).  Accordingly, there must be evidence supporting the penal-responsibility defense

presented during trial before a court is required to instruct the jury.

Additionally, the legislative history of HRS § 704-408 demonstrates that the legislature never intended to impose a duty on the court to sua sponte instruct the jury about lack of penal responsibility.  In 1980, the legislature amended HRS § 704-408, enacting the language at issue: "[T]he court shall submit the defense of physical or mental disease, disorder, or defect to the jury or the trier of fact at the trial of the charge against the defendant." (Emphasis added).  In doing so, the legislature's purpose was "to require that an insanity defense be submitted to a jury and disallow post-commitment or post-conditional release motions based upon factual grounds."[15] Conf. Comm. Rep. No. 72-80, in 1980 House Journal, at 1121.

Prior to the amendment, the "insanity defense [could] be heard by, and ruled on in the first instance, by the court at a pre-trial hearing."  Stand. Comm. Rep. 810-80, 1980 House Journal at 1655.  Under that procedure, a court could grant a judgment of acquittal for lack of penal responsibility before the case was even presented to a jury.  Id.  The legislature decided to eliminate this possibility.  As the conference

---

[15]    In fact, this was likely the legislature's response to the concerns about the insanity defense expressed at the Constitutional Convention of 1978.  Cf. S. Comm. Rep. No. 689-80, in 1980 Senate Journal, at 1335.

committee report explained, "the validity of an insanity claim should be subject to community scrutiny that a jury, or even a judge as a fact-finder at trial, provides."  Conf. Comm. Rep. No. 72-80, in 1980 House Journal, at 1121.  Thus, "shall" in HRS § 704-408 does not mean that the court must instruct the jury on lack of penal responsibility even if the defendant never raises the defense at trial, but that the court must submit the instruction to the jury and cannot dismiss a charge pre-trial for lack of penal responsibility.

Reading HRS § 704-408 in conjunction with HRS § 704-402 and HRS § 701-115, and in light of its legislative history, we conclude that HRS § 704-408 does not impose a duty on the trial court to instruct the jury on lack of penal responsibility when there is insufficient evidence at trial to support giving the instruction.

Moreover, as discussed above, significant consequences result if a defendant is found to lack penal responsibility, including indeterminate commitment to "an appropriate institution for custody, care, and treatment."  HRS § 704-411(1)(a).  For that reason, asserting the penal-responsibility defense is a decision that only the defendant can make.  Accordingly, it is questionable whether it would ever be appropriate for a court to raise lack of penal responsibility

40

over a defendant's objection.  See Jones, 664 P.2d at 1220

("[B]asic respect for a defendant's individual freedom requires

us to permit the defendant himself to determine his plea").

**D.   Glenn Did Not Present Sufficient Evidence of His Lack of Penal Responsibility to Require the Circuit Court to Instruct the Jury About the Defense**

Having established that the circuit court does not

have a duty to instruct the jury on lack of penal responsibility

when there is insufficient evidence offered at trial to support

the instruction, we must determine whether there was sufficient

evidence presented in this case.  We find that there was not.

None of the examiners who concluded that Glenn lacked

penal responsibility testified at trial, and the parties adduced

no other direct evidence about Glenn's mental health at the time

of the offense.  We recognize that aspects of Glenn's testimony

were bizarre.  For instance, he explained that he was a "master

mason," that he had a lab at McDonald's, and that he was

studying "anatomic nuclei."  However, Glenn's bizarre statements

during trial, without more, would not constitute evidence that

Glenn lacked penal responsibility "as a result of physical or

mental disease, disorder, or defect" at the time of the offense,

and so it would have been futile for the jury to consider the

defense.  Thus, the circuit court did not plainly err in failing

to instruct the jury about lack of penal responsibility.

## V. CONCLUSION

In sum, we hold that the Hawai'i Constitution protects defendants from being punished for committing a crime if they lack substantial capacity to appreciate the wrongfulness of their actions or to conform their conduct to the requirements of the law; thus, lack of penal responsibility as a defense must be available to defendants as a matter of due process, and the decision to assert the defense is for the defendant alone. For this reason, we hold prospectively that if the trial court receives notice that the defendant's penal responsibility is an issue in the case, the court must conduct a colloquy with a defendant to ensure that a waiver of the defense is intelligent, knowing, and voluntary. Finally, we hold that a trial court does not have a duty to sua sponte instruct a jury on lack of penal responsibility when there is insufficient evidence in the record to warrant such an instruction.

However, because we adopt the colloquy requirement prospectively, the trial court followed the rules in place at the time of Glenn's conviction, and there is no evidence in the record that Glenn's decision not to assert the defense was not a knowing, intelligent, or voluntary decision. And, as there was insufficient evidence presented at trial to require an

42

instruction on lack of penal responsibility, the trial court had no duty to sua sponte instruct the jury.

Accordingly, we affirm Glenn's conviction and the March 29, 2019 judgment of the ICA.

Emmanuel G. Guerrero
for petitioner

Sonja P. McCullen
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

