**Electronically Filed
Supreme Court
SCPW-20-0000509
18-FEB-2021
08:16 AM
Dkt. 110 ORDDS**

SCPW-20-0000509

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---

IN THE MATTER OF INDIVIDUALS IN CUSTODY

OF THE STATE OF HAWAI'I

---

ORIGINAL PROCEEDING

DISSENT TO AMENDED ORDER RE:  FELONY DEFENDANTS (FILED AUGUST 18, 2020); ORDER RE:  PETTY MISDEMEANOR, MISDEMEANOR, AND FELONY DEFENDANTS AT MAUI COMMUNITY CORRECTIONAL CENTER, HAWAI'I COMMUNITY CORRECTIONAL CENTER, AND KAUA'I COMMUNITY CORRECTIONAL CENTER (FILED AUGUST 24, 2020); ORDER RE:  PETTY MISDEMEANOR, MISDEMEANOR, AND FELONY DEFENDANTS (FILED AUGUST 27,2020);[1] AND ORDER DENYING PETITIONER'S "MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S ORDERS" (FILED SEPTEMBER 1, 2020)
(By:  Wilson, J.)

## I.  Introduction:  COVID-19 Poses a Lethal Threat to Hawai'i Inmates and This Court Has a Responsibility to Intervene

The rapid spread of COVID-19 has created an

unprecedented public health emergency declared by Governor Ige

---

[1]    Justice Wilson joins in part Justice McKenna's concurrence and dissent.  See Concurring & Dissenting Order to Order Re:  Petty Misdemeanor, Misdemeanor, & Felony Defendants, In re Individuals in Custody of Hawai'i, SCPW-20-0000509, docket #83, filed Aug. 27, 2020; infra note 45.

1

over eleven months ago.[2]  The Centers for Disease Control and
Prevention has acknowledged that inmates in correctional
facilities are among those that face the highest risk for
suffering the greatest harm from COVID-19.[3]  Inmates incarcerated
in the State of Hawaiʻi (the "State") have become victims of that
harm:  the Department of Public Safety ("DPS") reports more than
1200 inmates have contracted COVID-19 while incarcerated.[4]  Eight
inmates have died from COVID-19, with five inmates dying last
month alone at Halawa Correctional Facility ("HCF").[5]  Little is
known about these inmates or the circumstances of their deaths,
although DPS is required to conduct a mortality review and
submit a report to the legislature together with recommended

---

[2]     See COVID-19 Emergency Proclamation, Off. of Governor of Haw.
(Mar. 4, 2020), https://governor.hawaii.gov/wp-
content/uploads/2020/03/2003020-GOV-Emergency-Proclamation_COVID-19.pdf (last
visited Feb. 16, 2021).

[3]     See People at Increased Risk, Ctrs. for Disease Control and
Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/index.html (last updated Jan. 4, 2021).

[4]     See Dep't of Pub. Safety, Public Safety Department COVID-19
Testing Data, https://dps.hawaii.gov/blog/2020/03/17/coronavirus-covid-19-
information-and-resources/ (last visited Feb. 11, 2021) [hereinafter "DPS
COVID-19 Testing Data"]; Dep't of Pub. Safety, Department of Public Safety
Weekly Population Report (Feb. 1, 2021), https://dps.hawaii.gov/wp-
content/uploads/2021/02/Pop-Reports-Weekly-2021-02-01.pdf [hereinafter "DPS
Feb. 1, 2021 Population Report"] (reporting a total inmate population of 3121
across DPS facilities).

[5]     See State says 5 Halawa prison fatalities last month were COVID-
related, Haw. News Now (Feb. 5, 2021),
https://www.hawaiinewsnow.com/2021/02/06/state-says-halawa-prison-fatalities-
were-coronavirus-related/.

correctional action.[6]  What is known is that inmates in DPS

facilities have reason to be in constant fear that they will

contract a devastating, potentially lethal disease.[7]  This fear

is not unfounded given the high rate of infection facilitated by

---

[6]     Hawaiʻi Revised Statutes ("HRS") § 353C-8.5 (2019) requires, within thirty days of an inmate death, submission of a formal report "of the clinical mortality review conducted in response to the death, including correctional actions to be taken" to the legislature.  HRS § 353C-8.5(c).  The Hawaiʻi Correctional Systems Oversight Commission could also investigate the inmate deaths at HCF.  See HRS § 353L-3 (2019).

Media releases have stated that the five HCF inmates were over the age of sixty-five, and that one inmate died at Pali Momi Medical Center after being hospitalized for over a month.  See Press Release, Off. of Governor of Haw., Five Hawaii Inmate Deaths Classified as COVID-19 Related (Feb. 5, 2021), https://governor.hawaii.gov/newsroom/psd-news-release-five-hawaii-inmate-deaths-classified-as-covid-19-related/; Annalisa Burgos, Family of Halawa inmate who died from COVID-19 say state failed to prevent tragedy, KITV4 (Feb. 9, 2021), https://www.kitv.com/story/43323869/family-of-halawa-inmate-who-died-from-covid19-say-state-failed-to-prevent-tragedy.  Questions relevant to a mortality review are:  were these deaths all tied to the same outbreak?  What kind of medical care (e.g., ventilators) did these inmates have access to?  Did they die at HCF or in a hospital?  Why were these inmates over the age of sixty-five still incarcerated, and were they applying for parole, compassionate release, or some other form of expedited release?

[7]     See Decl. of Diane DiMaria at 5, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #94, filed Oct. 27, 2020 (attesting that her son, who is incarcerated at HCF, is "very scared that he will become infected with COVID-19—and might die from it"); Malika Dudley, MCCC Inmates Fear They are in Danger, KITV4 (Aug. 29, 2020), https://www.kitv.com/story/42561972/mccc-inmates-fear-they-are-in-danger.

The United States Supreme Court has also recognized the profound psychological trauma that can result from prolonged exposure to uncertain, stressful conditions, such as those experienced by prisoners on death row. See Glossip v. Gross, 576 U.S. 863, 926 (2015) (Bryer, J., dissenting) (noting that "'when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it'" (quoting In re Medley, 134 U.S. 160, 172 (1890)).

3

the extreme overcrowding among inmates.[8] Clusters of COVID-19 continue to break out within DPS facilities.[9] But inmates have not been prioritized for vaccination,[10] and are not included in the State's daily case count.[11] The recent deaths of the five HCF inmates should serve as a warning: inmates in DPS

---

[8] Inmates are commonly housed with two, and up to three, people per cell, making social distancing impossible. See Sept. 23, 2020 Decl. of Pablo Stewart, M.D. at 4-10, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #94, filed Oct. 27, 2020 [hereinafter "Sept. 23 Stewart Decl."]. Overcrowding can also lead to increased inmate-on-inmate violence. On August 31, 2020, OCCC was the site of a fatal beating of a COVID-19 positive man confined with two other COVID-19 positive men in the same cell. Kevin Dayton, 2 Inmates Killed in 2 Weeks In Hawaii Correctional System, Honolulu Civil Beat (Sept. 1, 2020), https://www.civilbeat.org/2020/09/2-inmates-killed-in-2-weeks-in-hawaii-correctional-system/.

[9] The Maui Community Correctional Center ("MCCC") is currently experiencing a growing cluster of COVID-19 cases: DPS reported MCCC's first positive case on February 1, and as of February 11, is reporting twenty active inmate cases with 101 inmates in quarantine and 28 inmates in medical isolation. See Wendy Osher, COVID-19 Cluster at Maui Jail Now Includes 20 Inmates, Maui Now (Feb. 11, 2021), https://mauinow.com/2021/02/11/covid-19-cluster-at-maui-jail-now-includes-20-inmates/; Press Release, Off. of Governor of Haw., Maui Community Correctional Center COVID-19 Testing Update (Feb. 5, 2021), https://governor.hawaii.gov/newsroom/psd-news-release-maui-community-correctional-center-covid-19-testing-update/. In response to the outbreak, all court hearings for MCCC inmates will be conducted via closed-circuit television until February 12. See Kevin Dayton, Maui Courts Go Remote After MCCC Inmates Test Positive, Honolulu Civil Beat (Feb. 5, 2021), https://www.civilbeat.org/beat/maui-courts-go-remote-after-mccc-inmates-test-positive/.

[10] See Kevin Dayton, ACLU Urges State To Allow At-Risk Inmates To Be Vaccinated Early, Honolulu Civil Beat (Jan. 11, 2021), https://www.civilbeat.org/beat/aclu-urges-state-to-allow-at-risk-inmates-to-be-vaccinated-early/.

[11] In December of 2020, the outbreak in Oʻahu correctional facilities was so severe that the Honolulu Mayor asked the Governor to remove positive inmate cases from the city's daily case counts, stating, "The Halawa [Correctional Facility] count is taking us up to numbers that I'm not comfortable with." Caldwell asks Gov. Ige to keep COVID-infected inmates out of Oahu case count, Haw. News Now (Dec. 14, 2020), https://www.hawaiinewsnow.com/2020/12/14/caldwell-reverses-course-moves-keep-covid-infected-inmates-out-oahu-reopening-metrics/.

facilities will continue to contract and die from COVID-19 while in the State's custody unless this court takes swift and decisive action.

The solution is straightforward and has been called for repeatedly: first, reduction of the inmate population in correctional facilities to design capacity so that social distancing can be properly implemented, and second, appointment of an independent expert who could monitor the conditions within correctional facilities to ensure that DPS is providing constitutionally humane conditions of confinement for inmates.

At the Oʻahu Community Correctional Center ("OCCC"),[12] the inmate population must be reduced to its design capacity of 628 inmates.[13] Design capacity is one of the primary remedies sought by the Office of the Public Defender ("Public Defender") and the American Civil Liberties Union ("ACLU") and its expert, Dr. Pablo Stewart ("Dr. Stewart").[14] This court, the special

---

[12] The looming COVID-19 threat caused by DPS's failure to rectify conditions of confinement for inmates is well-illustrated by, but not limited to, OCCC. While this dissent focuses largely on the conditions within OCCC, positive cases of COVID-19 have been reported across the State's other correctional facilities. See DPS COVID-19 Testing Data, supra note 4.

[13] The population of OCCC is approximately 950 inmates--more than 300 inmates over design capacity. See DPS Feb. 1, 2021 Population Report, supra note 4.

[14] See Petition for Writ of Mandamus at 14, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #1, filed Aug. 12, 2020; Brief for ACLU as Amici Curiae Supporting Petitioner at 34, In re Individuals in

(. . . continued)

5

master appointed by this court, the Hawaiʻi Correctional Systems Oversight Commission, the Kauaʻi County Prosecutor, and various other public health officials and experts all support reducing the inmate population in the face of a deadly pandemic.[15]  With the prison population reduced to design capacity and sufficient space to implement social distancing, new inmates could be thoroughly quarantined to ensure they do not introduce COVID-19 into OCCC, and potentially infected inmates could be placed in proper medical isolation so that COVID-19 is not further spread within OCCC.  Nonetheless, design capacity has never been achieved by DPS.[16]

---

(continued. . . )

Custody of Hawaiʻi, SCPW-20-0000509, docket #94, filed Oct. 27, 2020 [hereinafter "ACLU Brief"]; Apr. 13, 2020 Decl. of Pablo Stewart, M.D. at 2, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #80, filed April 13, 2020 [hereinafter "Apr. 13 Stewart Decl."]; Sept. 23 Stewart Decl. at 2, 9 (observing that "the inability to socially distance and overcrowding problem that OCCC faces has stayed constant throughout the pandemic").

[15]     See Order of Consolidation and for Appointment of Special Master at 3, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #22, filed Apr. 2, 2020; Initial Summary Report and Initial Recommendations of the Special Master at 33-34, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #51, filed Apr. 9, 2020; Amicus Letter in Support of Petitioner from Mark Patterson, Chair, Haw. Corr. Sys. Oversight Comm'n, to Chief Justice Mark E. Recktenwald (Mar. 31, 2020), Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #5, filed Mar. 31, 2020; Response of Justin F. Kollar at 3-5, Off. of Pub. Def. v. Connors, SCPW-20-0000200, docket #6, filed Mar. 26, 2020; Brief for Amici Curiae Public Health and Human Rights Experts Supporting Petitioner at 1, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #36, filed Apr. 6, 2020.

[16]     The earliest published corrections population report from DPS is dated December 31, 2014.  In the past 6 years, OCCC's population has never been at or below design capacity.  See Corrections Division, Dep't of Pub. Safety, https://dps.hawaii.gov/about/divisions/corrections/.

Reducing the population with due regard for public safety does not require the release of "violent" inmates into the community. The majority of inmates at OCCC are accused of committing nonviolent offenses, and many have been judged to be nonviolent as a basis for receiving probationary sentences with a limited term of incarceration. Many inmates have a history of poverty or homelessness, or struggle with mental illness, but most have not been accused of violent offenses. Reducing the population at OCCC does not necessarily require the release of inmates from custody at all; transfer to an alternative facility for completion of the sentence is also an option.[17]

The aforementioned remedies are necessary to rectify the severe overcrowding within State correctional facilities that allows COVID-19 to thrive and amounts to unconstitutional cruel and unusual conditions of confinement. See U.S. Const., amends. VII, XIV; Haw. Const., art. I, §§ 5, 12. Acute exposure to COVID-19 is particularly troubling for pretrial detainees because they are owed greater due process protection under the Fourteenth Amendment from punishment than inmates who have been convicted. See Bell v. Wolfish, 441 U.S. 520, 535 (1979). The

---

[17] Alternative incarceration arrangements are available, such as the vacant cells at the Federal Detention Center, additional temporary facilities at correctional institutions, and vacant hotels--all of which can be used for those who are being held pending trial and those who are serving short sentences for nonviolent offenses.

7

Public Defender has asked this court to intervene.  And it is our duty to do so to defend the rights of Hawai'i's incarcerated people under the constitutions of the United States and the State of Hawai'i.

**II.  A Timeline of the Rise of the COVID-19 Threat Within the O'ahu Community Correctional Center**

Approximately eleven months ago, on March 26, 2020, the Public Defender filed with this court its Petition for Writ of Mandamus to seek judicial relief from the failure of DPS to protect inmates from COVID-19.  In April, before the first infected inmate was identified in State correctional facilities this court recognized the conditions of incarceration and overcrowding at OCCC necessitated court intervention to protect inmates from the threat of contracting COVID-19.[18]  Reduction of the population to OCCC's design capacity of 628 inmates and social distancing were identified as necessary steps to relieve the inmates from the threat posed by COVID-19.[19]  Dr. Stewart,

---

[18]     Order of Consolidation and for Appointment of Special Master, <u>Off. of Pub. Def. v. Ige</u>, SCPW-20-0000213, docket #22, filed Apr. 2, 2020.

[19]     See Interim Order at 2, <u>Off. of Pub. Def. v. Ige</u>, SCPW-20-0000213, docket #88, filed Apr. 15, 2020 ("Efforts shall be undertaken to reduce the inmate population of correctional centers and facilities to design capacity."); Third Interim Order at 2, <u>Off. of Pub. Def. v. Ige</u>, SCPW-20-0000213, docket #108, filed Apr. 24, 2020 ("Efforts shall continue to be undertaken to reduce the inmate population of correctional centers and facilities to design capacity.").  The OCCC population in April was approximately 953 inmates.  See Dep't of Pub. Safety, Department of Public Safety Weekly Population Report (Mar. 31, 2020), https://dps.hawaii.gov/wp-
(. . . continued)

8

who has experience monitoring and assessing the COVID-19 risk in prison facilities, attested that "to avoid a COVID-19 catastrophe within DPS facilities, any process must include the target of reaching, at minimum, design bed capacity in each facility." Apr. 13 Stewart Decl. at 4. While COVID-19 had not yet been identified within OCCC, Dr. Stewart described the conditions in OCCC as "dangerously inadequate" and "a COVID-19 ticking time bomb."[20] Id. at 5. Faced with the COVID-19 threat, on April 2, 2020, this court appointed a special master to facilitate reduction of the inmate population by releasing inmates from correctional facilities.[21]

Approximately two months later, on June 5, 2020, the Majority concluded the proceeding and discharged the special master[22] with the unfounded assumption that the emergency

---

(continued. . . )

content/uploads/2020/04/Pop-Reports-EOM-2020-03-31.pdf [hereinafter "DPS Mar. 31, 2020 Population Report"].

[20] Despite these warnings, DPS contends that "it would have been impossible for the State's correctional facilities to remain free of COVID-19." DPS Response at 2, In re Individuals in Custody of Hawai'i, SCPW-20-0000509, docket #9, filed Aug. 14, 2020.

[21] Order of Consolidation and for Appointment of Special Master at 4, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #22, filed Apr. 2, 2020.

[22] Order Concluding Matters In This Consolidated Proceeding at 4, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #187, filed June 5, 2020.

conditions that caused this court to appoint the special master had passed.[23]

By August 13, 2020, COVID-19 was rampant in Hawaiʻi.[24] COVID-19 erupted in OCCC; it quickly became one of the largest, most active clusters of COVID-19 infection in the State.[25]  On August 18, the Director of the Department of Health, Dr. Bruce Anderson, described OCCC as the "perfect environment for the

---

[23]    Amended Dissent Re:  Order Concluding Matters In This Consolidated Proceeding at 7 n.15, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #191, filed June 8, 2020.

[24]    See Talal Ansari, Hawaii Is No Longer Safe From Covid-19, Wall St. J. (Aug. 28, 2020), https://www.wsj.com/articles/hawaii-is-no-longer-safe-from-covid-19-11598619600.

[25]    See Kevin Dayton, COVID-19 Cases Erupt At OCCC—70 More Inmates, 7 ACOs Test Positive, Honolulu Civil Beat (Aug. 13, 2020), https://www.civilbeat.org/2020/08/covid-19-cases-erupt-at-occc-70-more-inmates-7-acos-test-positive/.  As of February 10, 2021, DPS reported 450 recovered cases and no active cases of COVID-19 in OCCC.  DPS COVID-19 Testing Data, supra note 4.  However, this statistic cannot realistically be interpreted to mean that COVID-19 has been eliminated in OCCC.  Only twenty-one inmates were tested on February 3 and February 1, respectively, and seventeen inmates were tested on January 29.  See id.  There are more than 900 inmates incarcerated at OCCC.  See DPS Feb. 1, 2021 Population Report, supra note 4.  Minimal testing produces minimal risk of returning positive cases; sporadically testing two percent of the inmate population is neither an accurate nor a proactive means of ensuring that COVID-19 has actually been eliminated in OCCC.  This is not the "mass" or "widespread" testing DPS claims is helping control the spread of COVID-19 in its facilities.  Answer of Respondent Nolan P. Espinda at 2, 9, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #9, filed Aug. 14, 2020.  This "static, linear approach to testing" is "entirely inappropriate, and even dangerous." Sept. 23 Stewart Decl. at 7 (further noting that "a series of COVID-19 tests given on a single day or week only provides a snapshot of the situation in that precise moment," which "cannot tell you anything about trends, who is spreading to whom, or . . . whether the coronavirus is spreading more rapidly than before").

transmission of COVID" and the outbreak as "explosive."[26]  Since Dr. Anderson's statement, the population at OCCC has increased. The population of OCCC has now swelled to approximately 950 inmates--more than 300 inmates over design capacity.[27]  Over 500 people within OCCC have contracted COVID-19, including 450 inmates and 106 staff members.[28]

On August 12, 2020--six days before Dr. Anderson described the COVID-19 outbreak as "explosive"--the Public Defender initiated the present proceeding, again urgently seeking this court's intervention.[29]  Thus far, the Majority has declined to respond except to expand the category of inmates who are ineligible for expedited release:  any inmate who was arrested for violating the Governor's emergency proclamations, or who is awaiting test results, showing symptoms, or has tested positive for COVID-19 is excluded from the early release process.[30]

---

[26]     Dr. Bruce Anderson, State of Hawaiʻi Press Conference (August 18, 2020).

[27]     See DPS Feb. 1, 2021 Population Report, supra note 4.

[28]     DPS COVID-19 Testing Data, supra note 4.

[29]     See Petition for Writ of Mandamus at 14, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #1, filed Aug. 12, 2020.

[30]     See Order Re:  Petty Misdemeanor, Misdemeanor and Felony Defendants at 3-4, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #81, filed Aug. 27, 2020.

11

Shortly after the Public Defender initiated the present proceeding, in a related case,[31] the Majority again acknowledged the COVID-19 emergency at OCCC but paradoxically issued an order directly increasing the number of inmates held pretrial at OCCC.  The Majority suspended the right to release under Rules 5 and 10 of the Hawaiʻi Rules of Penal Procedure ("HRPP") of all people in the First Circuit of Oʻahu who chose to exercise their right to appear in person in court.[32]

## III. This Court has a Duty Under the United States and Hawaiʻi Constitutions to Ensure Safe Conditions of Confinement for Inmates

### A. Post-conviction inmates face unconstitutional cruel and unusual conditions of confinement.

The courts of the State of Hawaiʻi have a duty to protect inmates from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 5 and 12 of the Hawaiʻi Constitution.  To prove conditions of confinement are cruel and unusual under the Eighth Amendment, a post-conviction inmate

---

[31]    See In re Judiciary's Response to the COVID-19 Outbreak, SCMF-20-0000152.

[32]    Order Re:  Temporary Extension of the Time Requirements Under Hawaiʻi Rules of Penal Procedure Rule 10(a), (b), and (c) at 2, In re Judiciary's Response to the COVID-19 Outbreak, SCMF-20-0000152, docket #43, filed Aug. 18, 2020; Order Re:  Temporary Extension of the Time Requirements under Hawaiʻi Rules of Penal Procedure Rule 5(c)(3), In re Judiciary's Response to the COVID-19 Outbreak, SCMF-20-0000152, docket #47, filed Aug. 27, 2020.

must show that prison officials have acted with "deliberate indifference" as to the inhumane conditions. <u>Farmer v. Brennan</u>, 511 U.S. 825, 828 (1994). This court has yet to establish a standard by which to evaluate conditions of confinement claims brought by post-conviction inmates under article I, section 12 of the Hawaiʻi Constitution, but there is compelling reason to adopt a state standard ("objective reasonableness") that is more protective than the federal standard ("deliberate indifference").

> **1. Current conditions violate post-conviction inmates' Eighth Amendment rights under the deliberate indifference standard.**

The Eighth Amendment prohibition against cruel and unusual punishment arises from the basic concept of "the dignity of man." <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976) (internal citations omitted). An inquiry into the "excessiveness" of the punishment has two aspects: "First, the punishment must not involve the unnecessary and wanton infliction of pain. . . . Second, the punishment must not be grossly out of proportion to the severity of the crime." <u>Id.</u> (internal citations omitted). The United States Supreme Court has also explained that "the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." <u>Id.</u> at 183. <u>See also</u> Amended Dissent Re: Order Concluding Matters in This Consolidated Proceeding at 18-20,

13

Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #191, filed June 8, 2020.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain[]' . . . proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg, 428 U.S. at 173). A prison official is liable under the Eighth Amendment "for denying an inmate humane conditions of confinement" if he or she "knows of and disregards an excessive risk to inmate health or safety," is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and "draw[s that] inference." Farmer, 511 U.S. at 837.

Here, DPS is on notice that COVID-19 poses a risk of substantial harm to inmate health and safety. DPS knew "the disease ha[d] entered facilities and resulted in a disease cluster at OCCC." DPS Response to Petition at 2, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #9, filed Aug. 14, 2020. The Director of DPS, admitted approximately ten months ago in April, "I am also acutely aware of the risks of over-population and crowding in our correctional facilities especially during this pandemic." Letter from Nolan Espinda, Dir., Pub. Safety Dep't, to Mark Patterson, Chair, Haw. Corr. Sys. Oversight Comm'n 4 (Apr. 17, 2020)(available at Exhibits "1"–"5" of Second Summary Report and Recommendations of

14

the Special Master, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #102, filed Apr. 23, 2020).  DPS also knew of this court's "urgent and immediate concern in reducing the inmate populations" and stipulation that "[e]fforts shall be undertaken to reduce the inmate population . . . to design capacity." Interim Order at 3, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #3, filed Aug. 14, 2020; Interim Order at 2, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #88, filed Apr. 15, 2020.  And DPS's own expert acknowledged "that measures should be taken to decrease the number of inmates in OCCC to allow for better quarantine and isolation of infected inmates."  Decl. of Sarah K. Kemble, M.D. at 3, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #31, filed Aug. 17, 2020.

Yet, notwithstanding the proven threat of COVID-19 and the orders of this court, the overcrowding in OCCC worsened, with the inmate population swelling to 1025 inmates in January 2021, a more than 200 inmate increase over a six-month period.[33]

---

[33]    See Dep't of Pub. Safety, Department of Public Safety Weekly Population Report (Jan. 18, 2021), https://dps.hawaii.gov/wp-content/uploads/2021/01/Pop-Reports-Weekly-2021-01-18.pdf (listing OCCC's population as 1025 inmates); Dep't of Pub. Safety, Department of Public Safety Weekly Population Report (June 1, 2020), https://dps.hawaii.gov/wp-content/uploads/2020/06/Pop-Reports-Weekly-2020-06-01.pdf (listing OCCC's population as 816 inmates).

The population has dropped slightly to its current number:  949 inmates, about the same number at which this court first determined judicial intervention was necessary.[34]

### 2. Under an objective reasonableness standard, current conditions violate post-conviction inmates' rights under article I, section 12 of the Hawaiʻi Constitution.

This court has recognized as "well settled" that the State maintains a "special relationship" with a prisoner in its custody and has a duty "to take reasonable action to protect the prisoner against unreasonable risk of physical harm." Haworth v. State, 60 Haw. 557, 563, 592 P.2d 820, 824 (1979).  This is because, through incarceration, the State has deprived the prisoner of his "normal opportunities to protect himself, particularly through avoidance of places or situations which involve risk." Id. at 563-64, 592 P.2d at 824-25.  This court's articulation of the State's duty to act reasonably makes "objective reasonableness" a logical standard to impose under article I, section 12 of the Hawaiʻi Constitution. See also ACLU Brief at 17-21.

Although a federal standard under the Eighth Amendment--"deliberate indifference"--has been articulated by

_____

[34]    See DPS Feb. 1, 2021 Population Report, supra note 4.  The number of inmates at OCCC as of April 2, 2020, when the court first determined that intervention was necessary, was 953 inmates.  See DPS Mar. 31, 2020 Population Report, supra note 19.

16

the United States Supreme Court, see Kingsley v. Hendrickson, 576 U.S. 389 (2015),[35] this court has "long recognized . . . that 'as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawaiʻi Constitution, we are free to give broader protection under the Hawaiʻi Constitution than that given by the federal constitution.'" State v. Viglielmo, 105 Hawaiʻi 197, 210-11, 95 P.3d 952, 965-66 (2004) (collecting cases).[36] Where, as here, this court has already acknowledged a special duty owed by the State to a prisoner in its custody, this court should interpret the Hawaiʻi Constitution as affording greater due process protections than the federal Constitution.[37] Holding inmates in an overcrowded

---

[35] Kingsley is relevant to conditions of confinement claims brought by pretrial detainees. See discussion infra Section III.B.

[36] This court has recognized broader protections for criminal defendants under the Hawaiʻi Constitution in a variety of circumstances. See State v. Glenn, 148 Hawaiʻi 112, 123, 468 P.3d 126, 137 (2020) (penal responsibility for the severely mentally ill); State v. Rogan, 91 Hawaiʻi 405, 423, 984 P.2d 1231, 1249 (1999) (double jeopardy); State v. Hoey, 77 Hawaiʻi 17, 36, 881 P.2d 504, 523 (1994) (custodial interrogation); State v. Tanaka, 67 Haw. 658, 661-62, 701 P.2d 1274, 1276 (1985) (right to privacy).

[37] At least one other sister jurisdiction, Michigan, has expressly adopted this approach. See People v. Bullock, 485 N.W.2d 866, 872 (Mich. 1992) ("[A]t least three compelling reasons . . . exist to interpret our state constitutional provision more broadly . . . than the United States Supreme Court interpreted the Eighth Amendment."); cf. Walker v. State, 68 P.3d 872, 883 (Mont. 2003) (acknowledging that in "certain instances" it is appropriate to read the provision of the Montana Constitution affording every person human "dignity" together with that banning "cruel and unusual punishments" to "provide Montana citizens greater protections from cruel and unusual punishment than does the federal constitution"); Fleming v. Zant, 386 S.E.2d 339, 342 (Ga. 1989) (noting that "[f]ederal constitutional standards
(. . . continued)

facility where COVID-19 has and will continue to spread, infecting and potentially killing inmates, does not constitute "reasonable action" that protects inmates "against unreasonable risk of physical harm."

## B. Pretrial detainees face unconstitutional punishment.

We must also take care to distinguish between pretrial detainees and post-conviction inmates. See ACLU Brief at 13–14. "Because pretrial detainees are not convicted prisoners," their rights to challenge conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment, which prohibits the deprivation of life, liberty, or property without due process of law. Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir. 1996), abrogated on other grounds by Gordon v. Cty. of Orange, 888 F.3d 1118 (9th Cir. 2018). The "due process rights [of a pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." Id. Pretrial detainees are protected from any and all punishment--even punishment that does not rise to the level of cruel and unusual-

---

(continued. . . )

represent the minimum, not the maximum, protection that this state must afford its citizens," and applying a more lenient interpretation of what constituted cruel and unusual punishment in holding that mentally disabled people could not be executed in Georgia). See also ACLU Brief at 19 (arguing that "the federal standard does not meaningfully protect people who are incarcerated in correctional facilities from unjustified, state-created harm" (emphasis added)).

18

-and "may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell v. Wolfish, 441 U.S. 520, 535 (1979). Punishment of pretrial detainees is also prohibited by article I, section 5 of the Hawaiʻi Constitution. See Gordon v. Maesaka-Hirata, 143 Hawaiʻi 335, 358, 431 P.3d 708, 731 (2018) (adopting the Bell standard for claims brought under the Hawaiʻi Constitution).

A condition amounts to punishment when state officials express an intent to punish, the condition is "not reasonably related to a legitimate goal," or the condition is "excessive in relation to the alternative purpose assigned to it." Bell, 441 U.S. at 538-39 (internal quotation marks omitted). The subjective intent of the officials imposing the condition is not dispositive, and "'a pretrial detainee can prevail by providing only objective evidence' that his or her treatment lacked a rational relationship or was excessive in relation to a legitimate governmental purpose." Gordon, 143 Hawaiʻi at 349 n.19, 431 P.3d at 722 n.19 (quoting Kingsley v. Hendrickson, 576 U.S. 389, 398 (2015)). The issue here is whether pretrial detainees' current conditions of confinement are "objectively

19

unreasonable." Kingsley, 576 U.S. at 397.[38]  As mentioned above, holding pretrial detainees in an overcrowded facility where COVID-19 has been allowed to thrive cannot be regarded as objectively reasonable.  It is thus the constitutional duty of this court to order DPS to relieve inmates from the cruel and unusual conditions created by overcrowding and the threat of COVID-19.

**IV.  The Current Intervention Orders Do Not Address Cruel and Unusual Conditions of Confinement at OCCC, Design Capacity, or Social Distancing**

The Majority's current intervention orders resort to the same practices that failed to sufficiently reduce the inmate population to design capacity during April through June of 2020.  Moreover, the Majority's current orders establish two additional categories of inmates who are ineligible for expedited release, which adds to the inmate population at OCCC and exacerbates cruel and unusual conditions of confinement.

---

[38]  The Ninth Circuit has adopted Kingsley's objective standard, at least in the "failure-to-protect" context, noting that the United States Supreme Court in "Kingsley rejected the notion that there exists a single 'deliberate indifference' standard applicable to all § 1983 claims, whether brought by pretrial detainees or by convicted prisoners."  Castro v. Cty. of L.A., 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc).

**A.** **The Majority's second expedited release orders repeat the same methods that have proven insufficient to reduce the inmate population to design capacity.**

In its first expedited release orders in April, this court sought to address the lethal threat of COVID-19 by identifying categories of nonviolent inmates eligible for expedited, early release in order to reduce the population at OCCC to design capacity to allow for adequate social distancing. See Order of Consolidation and for Appointment of Special Master, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #22, filed Apr. 2, 2020; Interim Order, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #65, filed Apr. 10, 2020 [hereinafter "first expedited release orders"]. Although the number of inmates released was insufficient to achieve design capacity,[39] the Majority terminated its participation in June with the understanding that the emergency had subsided and DPS would take sufficient measures to protect the inmates from COVID-19. See Order Concluding Matters in This Consolidated Proceeding at 3, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #187, filed June 5, 2020. The inadequacy of the first expedited release orders and DPS's failure to address the cruel and unusual

---

[39] By April 30, 2020, the population at OCCC had been reduced to 779 inmates, 141 inmates over design capacity. See Dep't of Pub. Safety, Department of Public Safety End of Month Population Report (Apr. 30, 2020), https://dps.hawaii.gov/wp-content/uploads/2020/05/Pop-Reports-EOM-2020-04-30.pdf.

21

conditions at OCCC caused the Public Defender to file the instant Petition, again seeking the intervention of this court. In response, the court intervened in August with a second set of expedited release orders to again establish a list of categories of inmates eligible for early, expedited release. See Amended Order Re: Petty Misdemeanor and Misdemeanor Defendants, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #49, filed Aug. 17, 2020; Amended Order Re: Felony Defendants, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #51, filed Aug. 18, 2020; Order Re: Petty Misdemeanor, Misdemeanor and Felony Defendants at the Maui Community Correction Center, the Hawaiʻi Community Correction Center, and the Kauaʻi Community Correctional Center, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #61, filed Aug. 24, 2020; Order Re: Petty Misdemeanor, Misdemeanor and Felony Defendants, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #81, filed Aug. 27, 2020 [hereinafter "second expedited release orders"].

Respectfully, the limited intervention in the Majority's second expedited release orders has not been effective. The categories of inmates identified in the second expedited release orders are practically unchanged from the categories of eligible inmates in the Majority's first expedited release orders. When applied by the trial judges, the first

22

expedited release orders failed to achieve a meaningful reduction of the population at OCCC.[40]  See Amended Dissent Re: Order Concluding Matters in This Consolidated Proceeding at 12-13, Off. of Pub. Def. v. Ige, SCPW-20-0000213, docket #191, filed June 8, 2020.[41]  At the time the first expedited release orders were entered in April, there were 953 inmates at OCCC.[42]  Notwithstanding the second expedited release orders entered on August 17, 18, 24, and 27, the population thereafter increased to more than one thousand inmates and is now 949 inmates-- approximately the same overcrowded population that caused this court to order the initial expedited release of inmates over nine months ago.[43]  Thus, as with the first expedited release orders, the number of inmates released pursuant to the second expedited release orders has been inadequate to protect inmates from the overcrowded, cruel and unusual conditions at OCCC.

---

[40]    The second expedited release orders add to the inmates eligible for early release:  inmates "awaiting adjudication of motions for revocation or modification of probation or motions to set aside or modify deferral," and "pretrial inmates who have pled guilty or no-contest and are awaiting sentencing, subject to exceptions" are now eligible for release.  Amended Order Re:  Felony Defendants at 1 n.1, In re Individuals in Custody of Hawai'i, SCPW-20-0000509, docket #51, filed Aug. 18, 2020.  But, as discussed below, the new orders also add to the inmates who are ineligible for early release.

[41]    See also supra note 39.

[42]    See DPS Mar. 31, 2020 Population Report, supra note 19.

[43]    See DPS Feb. 1, 2021 Population Report, supra note 4.

23

**B.     Rather than reduce the inmate population, the Majority's second expedited release orders add to the population.**

In its second expedited release orders, the Majority carves out two new categories of inmates who are excluded from early release consideration.  First:  all people in Hawaiʻi arrested for or convicted of misdemeanor offenses arising from the violation of the Governor's emergency proclamations.[44] Though presumed not guilty and arrested for a nonviolent offense, this new category of pretrial detainee is excluded from the early release process and thus subjected to the cruel and unusual conditions within OCCC.  Justice McKenna clearly identifies in her dissent the aggravated COVID-19 threat that will result from excluding this new category of inmates from the early release process:

> [T]he order as written allows incarceration of quarantine violators in our correctional centers.  I believe that allowing this option contravenes the very purpose of our

---

[44]     The Majority ordered:

2.  For the purpose of this order, the following are "excluded offenses":

        . . . .

        (g) violation of interstate or intrastate travel quarantine requirements, as ordered pursuant to HRS ch. 127A[.]

Order Re:  Petty Misdemeanor, Misdemeanor and Felony Defendants at 3-4, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #81, filed Aug. 27, 2020.

24

> orders—-to reduce and eventually eliminate COVID-19 in our correctional centers. I would encourage our trial judges not to send quarantine violators, who may be infected with COVID-19, to our community correctional centers.

Concurring & Dissenting Order to Order Re: Petty Misdemeanor, Misdemeanor, & Felony Defendants at 2, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #83, filed Aug. 27, 2020.[45]

Second, the Majority's second expedited release orders also disqualify from early release all those who "have COVID-19, are awaiting test results or . . . show symptoms," even if they would otherwise be eligible for release. Amended Concurring and Dissenting Order Re: Petty Misdemeanor and Misdemeanor Defendants at 4, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #49, filed Aug. 17, 2020. The Majority's decision to exclude from emergency release those who are awaiting test results, showing symptoms, or have tested positive for COVID-19 arbitrarily discriminates against inmates who would otherwise be eligible for release, thus perpetuating the overcrowded conditions at OCCC. See Amended Concurring and Dissenting Order Re: Petty Misdemeanor and Misdemeanor Defendants at 4-7, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #49, filed Aug. 17, 2020.

---

[45] I join Justice McKenna's dissent.

25

The exclusion of inmates from emergency release orders on the basis of COVID-19 discrimination classifications is akin to criminalizing disease, a practice that violates the Eighth Amendment. See Robinson v. California, 370 U.S. 660, 666-67 (1962) (noting that "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold"). Respectfully, the Majority punishes inmates within the COVID-19 discrimination classifications solely because they have or might have COVID-19. In excluding persons from the emergency release order on the basis of the COVID-19 discrimination classifications, the Majority arbitrarily subjects them to suffering in the form of prolonged exposure to a deadly disease without the ability to protect themselves. As Justice Douglas noted in his concurrence in Robinson, "[w]e would forget the teachings of the Eighth Amendment if we allowed sickness to be made a crime and permitted sick people to be punished for being sick. This age of enlightenment cannot tolerate such barbarous action." Id. at 678 (Douglas, J., concurring). Justice Douglas explained that the same Eighth Amendment "principle that would deny power to exact capital punishment for a petty crime would also deny power to punish a person by fine or imprisonment for being sick." Id. at 676 (Douglas, J., concurring).

26

**V.    Suspension of the Right to Arraignment and Preliminary Hearing Adds to the Population at OCCC, and Violates Pretrial Inmates' Right to Due Process of Law**

In a related case,[46] in August, the Majority added to the incarcerated population at OCCC, and in so doing exacerbated the overcrowded, cruel and unusual conditions of confinement therein.  Specifically, the Majority suspended the right to be released from custody of all inmates on Oʻahu who wish to appear in person before the court to plead guilty at arraignment or who wish to appear in person at a preliminary hearing.[47]  See Order

---

[46]    See In re Judiciary's Response to the COVID-19 Outbreak, SCMF-20-0000152.  A dissent in that case is forthcoming.

[47]    The Majority suspends the right to be released from custody of those awaiting their arraignment for more than fourteen days who wish to plead guilty and the right to be released of those forced to wait more than two days for their preliminary hearing.  HRPP Rule 5(c)(3) provides:

> The court shall conduct the preliminary hearing within 30 days of initial appearance if the defendant is not in custody; however, if the defendant is held in custody for a period of more than 2 days after initial appearance without commencement of a defendant's preliminary hearing, the court, on motion of the defendant, shall release the defendant to appear on the defendant's own recognizance, unless failure of such determination or commencement is caused by the request, action or condition of the defendant, or occurred with the defendant's consent, or is attributable to such compelling fact or circumstance which would preclude such determination or commencement within the prescribed period, or unless such compelling fact or circumstance would render such release to be against the interest of justice.

HRPP Rule 5(c)(3).

HRPP Rule 10 provides:

> (a) A defendant who has been held by district court to answer in circuit court shall be arraigned in circuit court

(. . . continued)

Re:  Temporary Extension of the Time Requirements Under Hawaiʻi Rules of Penal Procedure Rule 10(a), (b), and (c), <u>In re Judiciary's Response to the COVID-19 Outbreak</u>, SCMF-20-0000152, docket #43, filed Aug. 18, 2020; Order Re:  Temporary Extension of the Time Requirements Under Hawaiʻi Rules of Penal Procedure Rule 5(c)(3), <u>In re Judiciary's Response to the COVID-19 Outbreak</u>, SCMF-20-0000152, docket #47, filed Aug. 27, 2020 [hereinafter "suspension orders"].

The Majority's unprecedented order suspends the right of all arrested people on Oʻahu to be released from police custody within the time limits set by HRPP Rules 5 and 10.  The Majority initiated the suspension orders citing the "public health emergency" caused by the "surge of COVID-19 cases," both within the State and "in our community correctional centers and

---

(continued. . .)

within 14 days after the district court's oral order of commitment following (i) arraignment and plea, where the defendant elected jury trial or did not waive the right to jury trial or (ii) initial appearance or preliminary hearing, whichever occurs last.

(b) Following service of grand jury warrant, a defendant arrested in the jurisdiction or returned to the jurisdiction shall be arraigned not later than 7 days following the arrest or return.

(c) Following service of an information charging warrant of arrest, a defendant arrested in the jurisdiction or returned to the jurisdiction shall be arraigned not later than 7 days following arrest or return.

HRPP Rule 10.

28

facilities."  No request was made to the court by the prosecutor to suspend the rights of people held pretrial.  No agreement to suspend the rights of the affected defendants was reached with their defense counsel.  No hearing was held for the defendants who lost their right to be released from custody.  Thus, no record exists to support the Majority's unilateral conclusion that the spread of COVID-19 among inmates and correctional staff has rendered it impossible for the State's Judiciary (the "Judiciary") to comply with the rights of detainees to be released from custody pursuant to HRPP Rules 5 and 10.

The suspension of the right to a prompt arraignment and preliminary hearing for inmates on Oʻahu is particularly troubling because it indiscriminately affects the fundamental liberty rights of pretrial detainees presumed to be not guilty and who have not been shown to present any threat to our community.[48]

---

[48] "A fundamental constitutional right is one that is 'explicitly or implicitly guaranteed by the Constitution.'"  Estate of Coates v. Pac. Eng'g, 71 Haw. 358, 363, 791 P.2d 1257, 1260 (1990) (quoting San Antonio Sch. Dist. v. Rodrigues, 411 U.S. 1, 33-34 (1973)).  The rights to a prompt arraignment and preliminary hearing are fundamental because they stem from the Due Process Clause of both the United States and Hawaiʻi constitutions.  See U.S. Const. amend. XIV, § 2; Haw. Const. art. I, § 5.  Several other jurisdictions have explicitly enshrined as fundamental the right to a prompt arraignment and preliminary hearing.  See People v. Thompson, 611 P.2d 883, 897 (Cal. 1980) ("The right to a prompt arraignment is 'a fundamental right of the arrested person.'"); People v. Hendrix, 295 N.E.2d 724, 727 (Ill. 1973) (discussing the "defendant's constitutional right to a prompt preliminary hearing").

29

**A.** **There is no evidence that the unilateral, sua sponte action of the Majority is the least restrictive means possible.**

For government action that denies a fundamental right to be upheld as constitutional, a court must find that the state has a compelling interest, that this interest outweighs the harm suffered by the individuals affected, and that the action is the least restrictive means possible. See McCloskey v. Honolulu Police Dep't, 71 Haw. 568, 576, 799 P.2d 953, 957 (1990).

Here, even presuming that protecting public health and safety is a compelling interest, there is no evidence that a blanket suspension of rights is the least restrictive means possible. Without evidence to assess least restrictive means, the Majority suspended the rights of inmates on Oʻahu to an arraignment "no longer than reasonably necessary to protect public health and safety." Suspension Orders at 3. What is "reasonably necessary" has proven to be indefinite; the initial suspension has been extended several times.[49] No evidence supports the Majority's conclusion that the number of inmates

---

[49] The most recent extension expires on March 31, 2021. See Fifth Extension of the Time Requirements Under Hawaiʻi Rules of Penal Procedure Rule 5(c)(3), In re Judiciary's Response to the COVID-19 Outbreak, SCMF-20-0000152, docket #91, filed Feb. 8, 2021; Fifth Extension of the Time Requirements Under Hawaiʻi Rules of Penal Procedure Rule 10(a), (b), and (c), In re Judiciary's Response to the COVID-19 Outbreak, SCMF-20-0000152, docket #93, filed Feb. 8, 2021.

held pretrial who seek to assert their rights to be released pursuant to HRPP Rules 5 and 10 is so overwhelming that the resources of the Judiciary and DPS are inadequate to provide them with an arraignment or preliminary hearing within the time limits set by Rules 5 and 10.  The number of people awaiting arraignment who wish to plead guilty has not been established.[50]  There is no evidence that the number is significant.  On the contrary, it is uncommon for defendants to plead guilty at arraignment.  Nor is there any factual support for the proposition that there exists such an overwhelming number of preliminary hearings as to preclude transport of the people who have a right to be released within two days of their

_____

[50]    Pursuant to HRPP Rule 43, only a defendant intending to plead guilty is guaranteed to the right to appear in person for an arraignment. HRPP Rule 43 states:

> (a) Presence required.  The defendant shall be present at the arraignment, at the time of the plea, at evidentiary pretrial hearings, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this Rule.
>
>     . . . .
>
> (e) Presence may be by video conference.
>
>     (1) The court may conduct by video conference, without the consent of the defendant, an arraignment wherein it accepts a plea of not guilty;

HRPP Rule 43(a), (e).

incarceration if a preliminary hearing is not held.[51]  With no factual basis to assume the number of detainees awaiting arraignment or a preliminary hearing will overwhelm the Judiciary, the Majority cannot reach a reasoned judgment that no less restrictive means are available to allow proceedings in accordance with HRPP Rules 5 and 10.

**B.    A hearing should be held to determine if suspending HRPP Rules 5 and 10 is necessary and what less restrictive measures are available in the alternative.**

This court has a duty to avoid restricting the individual liberties of pretrial detainees.  The court cannot suspend pretrial detainees' rights by raw fiat, but instead is required to employ the least restrictive means to ensure that fundamental rights are not compromised.  See McCloskey, 71 Haw. at 576, 799 P.2d at 957.[52]  At the very least, due process requires holding a hearing at which least restrictive means can be considered by this court.

As discussed above, no record establishes that transporting inmates to court or conducting the limited proceedings necessary to protect their fundamental liberty interest creates an undue burden to public safety or the

---

[51]    The alternative to a preliminary hearing of obtaining an indictment or proceeding by information is generally preferred to release by the prosecution.

[52]    See also supra note 48 and accompanying text.

32

Judiciary. Nor is there a record reflecting any consideration of alternatives that would eliminate the need to transport inmates to a courtroom. There is no evidence that proceedings cannot be conducted at OCCC where the people being held pretrial are located. There is no evidence that, if the number of available courtrooms for in-person proceedings is limited, the courtroom of the Supreme Court could not be used. If a shortage of circuit and district court judges is established during a hearing, willing Supreme Court Justices could conduct the arraignments or preliminary hearings either at OCCC or in the courtroom of the Supreme Court. Such an exercise of this court's emergency authority permitting justices of this court to act as circuit court judges would be a less restrictive measure than the suspension of the liberty interests of all pretrial detainees under HRPP Rules 5 and 10.

Least restrictive means must also be considered to determine how long the liberty interests of inmates awaiting arraignment and preliminary hearing must be suspended. No information has been provided to this court as to how long resources will be unavailable to meet the demand posed by those pretrial detainees who wish to exercise their right to be released from custody under HRPP Rules 5 and 10. There is no record that illustrates an emergency precluding application of HRPP Rules 5 and 10. Absent such a record, the Majority is

33

incapable of evaluating the length of suspension that is necessary to address the emergency.

C. **The Majority's suspension conflicts with the protective nature of HRPP Rules 5 and 10.**

The Majority's indefinite suspension of HRPP Rules 5 and 10 conflicts with the protective nature of both rules. HRPP Rule 10 sets forth a specific timeline for the arraignment of a defendant. See HRPP Rule 10. When that timeline cannot be met, the rule requires dismissal of the charge without prejudice. See State v. Basnet, 131 Hawaiʻi 286, 287, 318 P.3d 126, 127 (2013). HRPP Rule 5 similarly counsels in favor of release. If a preliminary hearing is not held within two days of an in-custody defendant's initial appearance, the court must release the defendant. Three narrow exceptions apply. First, if the defendant caused or consented to the delay in the preliminary hearing, release is not mandated. HRPP Rule 5(c)(3). Second, release is not mandated if a "compelling fact or circumstance" precludes holding a timely preliminary hearing. Id. Lastly, release is not mandated if such fact or circumstance "would render such release to be against the interest of justice." Id.

This court recently scrutinized the history, structure, and language of HRPP Rule 5(c)(3) and held that the record must "support a finding that compelling circumstances exist[] to overcome the strong presumption that release [i]s

34

required." Moana v. Wong, 141 Hawaiʻi 100, 115, 405 P.3d 536, 551 (2017) (emphasis added). We found that HRPP Rule 5(c)(3)'s "history demonstrates this jurisdiction's strong commitment to protecting defendants held in custody by providing a prompt preliminary hearing," and noted that detention without a preliminary hearing beyond the prescribed time period "is permissible only in very limited situations." Id. at 110, 405 P.3d at 546. This court also held that a "compelling circumstance" must be sufficiently grave, and "must actually result in preclusion of" a timely preliminary hearing. Id. at 112, 405 P.3d at 548. The sua sponte suspension ordered by this court without a record is inconsistent with our admonition that any continuance granted under HRPP Rule 5(c)(3) "must be no longer than needed to resolve" the compelling circumstance asserted, and that "[t]he court must be informed how the State intends to expeditiously address" such circumstance. Id.

In Moana, this court made clear that HRPP Rule 5(c)(3) requires release unless its presumption is rebutted by a strong evidentiary showing. Our reasoning in Moana is equally applicable to the situation at hand. There is no doubt preventing the spread of COVID-19 from within OCCC to the Judiciary and outside community is a legitimate goal for the State. But with no hearing or record establishing a compelling need to suspend the liberty interests of pretrial detainees,

35

there is no evidence that the spread of COVID-19 <u>actually</u>

<u>precludes</u> giving pretrial detainees timely preliminary hearings

or arraignments.  There is no evidence that a compelling state

interest exists to justify the indeterminate length and ongoing

nature of the suspension.

The Majority's suspension of the rights of pretrial

detainees to an arraignment within fourteen days and a

preliminary hearing within two days exacerbates the cruel and

unusual conditions for inmates at OCCC by increasing the inmate

population at OCCC.  The suspension actively conflicts with

efforts to reduce the severe overcrowding that poses a lethal

threat to the inmates at OCCC and makes social distancing

impossible at the facility.[53]  Put simply, the Majority's

suspension relegates pretrial detainees--who have not been

convicted of any crime and are presumed not guilty--to the

frightening and dangerous circumstances of an overcrowded jail

in the middle of a life-threatening pandemic.  A blanket

suspension of HRPP Rules 5 and 10 cannot be justified as

necessary or proportional, and therefore, it does not comport

---

[53]    As of February 1, 2021, OCCC had an inmate count of 949, far
above its design capacity of 628.  <u>See</u> DPS Feb. 1, 2021 Population Report,
<u>supra</u> note 4.  Of those 949 inmates, 452 were being held pretrial on felony
charges, and fifty-five were being held pretrial on misdemeanor charges.  <u>See</u>
<u>id.</u>

with this court's duty to uphold the constitutional rights of pretrial detainees.[54]

## VI. Judicial Intervention is Again Required to Protect Inmates at OCCC from Cruel and Unusual Conditions of Confinement

OCCC is prime habitat for COVID-19, at the peril of our community both within the walls of OCCC and beyond.[55][56]   Human

---

[54]   See also Concurrence and Dissent Re:  Order Re:  Temporary Extension of the Time Requirements Under Hawaiʻi Rules of Penal Procedure Rule 10(a), (b), and (c) at 1, In re Judiciary's Response to the COVID-19 Outbreak, SCMF-20-0000152, docket #45, filed Aug. 20, 2020.

[55]   The number of available hospital and ICU beds on Oʻahu declined due to the increasing spread of COVID-19 infections in the community.  See COVID-19 Dashboard, Hawaiʻi Emergency Management Agency, available at https://hiema-hub.hawaii.gov/pages/covid-dashboard.  As of February 5, 2021, there were sixty-four people hospitalized with COVID-19 in the State.  See id.  Another outbreak in correctional facilities that requires the hospitalization of inmates and correctional staff would further burden the healthcare system that serves our entire community.

This is also concerning given the development of new variants of the virus, which could very well lead to another wave of cases.  As of February 7, 2021, state health officials had identified nine cases of the Denmark L452R variant and two cases of the highly transmissible U.K. B1.1.7 variant in Hawaiʻi.  See Hawaii sees second case of U.K. variant, 108 new infections, Honolulu Star Advertiser (Feb. 7, 2021), https://www.staradvertiser.com/2021/02/07/hawaii-news/hawaii-sees-second-case-of-u-k-variant-108-new-infections/.  Particularly concerning is the spread of the South African variant, which has not yet been identified in Hawaiʻi, but "shows signs of reducing the effectiveness of vaccines."  Eleni Avendaño, More Contagious UK Variant Of COVID-19 May Have Been Found In Hawaii, Honolulu Civil Beat (Feb. 2, 2021), https://www.civilbeat.org/2021/02/more-contagious-uk-variant-of-covid-19-may-have-been-found-in-hawaii/.

[56]   Eradicating COVID-19 in OCCC also serves the community at large because inmates infected by COVID-19 have a right to be released at the conclusion of their sentences, regardless of the possibility that they will spread COVID-19 after their release.  Several federal courts have held that detaining an inmate beyond the end of his or her sentence may violate the Eighth Amendment and/or the Fourteenth Amendment.  See, e.g., Haygood v. Younger, 769 F.2d 1350, 1354 (9th Cir. 1985); Moore v. Tartler, 986 F.2d 682, 686 (3d Cir. 1993); Campbell v. Peters, 256 F.3d 695, 700 (7th Cir. 2001).  All the incarcerated men and women within OCCC have only eighteen months or

(. . . continued)

vectors for COVID-19 circulate in and out of OCCC each day in significant numbers; new inmates pose the potential to carry COVID-19 into OCCC or become likely candidates for infection; and extensive overcrowding makes social distancing impossible. DPS maintains the position that it is "impossible for the State's correctional facilities to remain free of COVID-19." DPS Response to Petition at 2, In re Individuals in Custody of Hawai'i, SCPW-20-0000509, docket #9, filed Aug. 14, 2020. Resignation to the presence of COVID-19 at OCCC, or any DPS facility, is not an option available to this court. Instead of intervening, however, the Majority has returned to past practices that failed to adequately reduce the inmate population, and increased the inmate population by suspending HRPP Rules 5 and 10 and by disqualifying more inmates from the expedited release process. As a result, the conditions of confinement at OCCC continue to contravene the federal and state constitutional mandates that inmates not be subjected to cruel and unusual punishment.

---

(continued. . . )

less to serve on their sentences. A significant number will be released every month as they finish their sentences for misdemeanors and petty misdemeanors that have maximum sentences of no more than eighteen months and thirty days, respectively.

38

This court must grant the relief requested by the Public Defender and amici. Consistent with following a scientific, medically sound approach to a public health crisis, the Public Defender specifically requests that DPS reduce inmate populations to design capacity and seeks the appointment of an expert who can inspect OCCC and further recommend to this court a process by which COVID-19 can be eliminated from DPS correctional facilities.[57][58]

---

[57] The Public Defender requested the following relief:

To mitigate the harm that the COVID-19 pandemic will inflict upon people incarcerated and detained in prison and jail, correctional staff, and the people of Hawaiʻi, Petitioner respectfully requests, at minimum, the following relief:

1. Order the DPS to adhere to the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in all correctional centers and correctional facilities.

2. Order testing for COVID-19 for all inmates, staff and ACOs ["adult corrections officers"].

3. Appoint a public health expert to enter into all correctional centers and correctional facilities and review protocols, the ability to social distance, and make recommendations.

4. Order the Circuit, Family and District Courts, the Department of Public Safety, and the Hawaiʻi Paroling Authority to reduce the population of its Correctional Centers and Correctional Facilities to allow for the social separation and other measures recommended by the CDC to prevent the spread of COVID-19 by taking immediate steps to reduce the population of its Correctional Centers and Correctional Facilities to their design capacity.

5. Order the Circuit, Family and District Courts that when adjudicating motions for release, (1) release shall be presumed unless the court finds that the release of the inmate would pose a significant risk to the safety of the

(. . . continued)

39

(continued. . . )

inmate or the public; (2) design capacity (as opposed to operational capacity) of the correctional center or facility shall be taken into consideration; (3) and the health risk posed by the COVID-19 pandemic. Motions for release based on the foregoing are for the following categories of inmates:

a. Inmates serving a sentence (not to exceed 18 months) as a condition of felony deferral or probation except for (I) inmates serving a term of imprisonment for a sexual assault conviction or an attempted sexual assault conviction; or (ii) inmates serving a term of imprisonment for any felony offense contained in HRS chapter 707, burglary in the first or second degree (HRS §§ 708-810, 708-811), robbery in the first or second degree (HRS §§ 708-840, 708-841), abuse of family or household members (HRS § 709-906(7)&(8)), and unauthorized entry in a dwelling in the first degree and in the second degree as a class C felony (HRS §§ 708-812.55, 708-812.6(1) & (2)), including attempt to commit these specific offenses (HRS §§ 705-500, 705-501).

b. Inmates serving sentences for misdemeanor or petty misdemeanor convictions except those convicted of abuse of family or household members (HRS § 709-906), violation of a temporary restraining order (HRS § 586-4), violation of an order for protection (HRS § 586-11), or violation of a restraining order or injunction (HRS § 604-10.5).

c. All pretrial detainees charged with a petty misdemeanor or a misdemeanor offense, except those charged with abuse of family or household members (HRS § 709-906), violation of a temporary restraining order (HRS § 586- 4), violation of an order for protection (HRS § 586-11), or violation of a restraining order or injunction (HRS § 604-10.5).

d. All pretrial detainees charged with a felony, except those charged with a sexual assault or an attempted sexual assault, any felony offense contained in HRS chapter 707, burglary in the first or second degree (HRS §§ 708-810, 708-811), robbery in the first or second degree (HRS §§ 708-840, 708-841), abuse of family or household members (HRS § 709-906(7)&(8)), and unauthorized entry in a dwelling in the first degree and in the second degree as a class C felony (HRS §§ 708-812.55, 708-812.6(1) & (2)), including attempt to commit these specific offenses (HRS §§ 705-500, 705-501).

(. . . continued)

(continued. . . )

       6.  Order the Circuit, Family and District Courts to suspend the custodial portion of such sentence until the conclusion of the COVID-19 pandemic or deemed satisfied for individuals serving intermittent sentences.

       7.  Order that the practice of no cash bail, including the release of inmates on their own recognizance, on signature bonds, or on supervised release, should be regularly employed, and pretrial detainees who are poor and not a risk to public safety or a flight risk should not be held simply because they do not have the means to post cash bail.

       8.  Order the Hawaiʻi Paroling Authority to move forward to expeditiously address requests for early parole consideration, including conducting hearings using remote technology.  The Hawaiʻi Paroling Authority should also consider release of inmates who are most vulnerable to the virus, which includes inmates who are 65 years old and older, have underlying conditions, who are pregnant, and those inmates being held on technical parole violations (i.e. curfew violations, failure to report as directed, etc.) or who have been granted community or minimum security classifications and are near the end of their sentences.  The Paroling Authority shall prepare and provide periodic progress reports to the parties of their efforts and progress in this respect.  The list should include the names of the inmates who have been granted release, the names of the inmates who are under consideration for release, and the names of the inmates who were considered for release but for whom release was denied.

       9.  Order the DPS to cooperate and be responsive to the Hawaiʻi Correctional Systems Oversight Commission's requests with respect to reconsidering, lowering and monitoring the operational capacities of Hawaiʻi correctional centers and facilities, and with respect to the conditions of confinement during the COVID-19 pandemic.

Petition for Writ of Mandamus at 14-16, In re Individuals in Custody of Hawaiʻi, SCPW-20-0000509, docket #1, filed Aug. 12, 2020.

    [58]    The expert would help address important yet unanswered questions that are critical to controlling COVID-19 within DPS facilities, including, but not limited to:  Whether design capacity (or some lower number) is, in fact, the optimal number at which social distancing can be achieved.  Should inmates receive priority access to vaccinations?  How can officials implement consistent mass testing that represents an accurate picture of the COVID-19

(. . . continued)

41

The relief sought by the Public Defender and amici is grounded in a constitutionally defined standard of human decency and justice: the right to be free from cruel and unusual punishment. The frightening and dangerous conditions within OCCC and other State correctional facilities subject inmates to a "gratuitous infliction of suffering" that serves no penological purpose. There is no humane balance between the fear of contracting a lethal disease and the incarceration of those who are held for a nonviolent crime because poverty prevents them from posting bail. There is no penological purpose that outweighs the release of pregnant inmates detained for nonviolent crimes. There is no brand of justice that allows the incarceration of immunocompromised or elderly inmates who are accused of nonviolent offenses. Yet, given the ever-present threat of COVID-19, gratuitous suffering serving no penological purpose is what distinguishes the circumstance of most of the men and women at OCCC.

As occupants of a proven favorable habitat for COVID-19, the inmates at OCCC have good reason to fear contracting a

(continued. . . )

situation within DPS facilities? How effective are current screening methods in ensuring that new inmates, staff, and visitors do not carry COVID-19 into DPS facilities, and how can these methods be improved? How can inmates who exhibit symptoms or test positive for COVID-19 be quarantined in a way that is least detrimental to their mental health?

42

lethal disease. By incarcerating, the State has taken away their freedom to protect themselves from COVID-19. The presumption of innocence for all pretrial detainees held in OCCC, the nature of the nonviolent crimes of which most inmates are accused or convicted, and the fear of death inmates must live with after COVID-19 has "exploded" at OCCC,[59] all weigh in favor of judicial intervention to protect the right of inmates at OCCC to be free from cruel and unusual conditions of confinement. To do so is to comply with our duty to apply the mercy embraced by the Eighth and Fourteenth Amendments of the United States Constitution and article I, sections 5 and 12 of the Hawaiʻi Constitution.[60]

## VII. Conclusion

I therefore respectfully dissent to the failure of the Majority to intervene as requested by the Public Defender and

_____

[59] See supra note 26.

[60] Lawyer and social justice scholar Bryan Stevenson explains the danger of a society that lacks compassion and tolerates injustice:

> We are all implicated when we allow other people to be mistreated. An absence of compassion can corrupt the decency of a community, a state, a nation. Fear and anger can make us vindictive and abusive, unjust and unfair, until we all suffer from the absence of mercy and we condemn ourselves as much as we victimize others. The closer we get to mass incarceration and extreme levels of punishment, the more I believe it's necessary to recognize that we all need mercy, we all need justice, and-perhaps-we all need some measure of unmerited grace.

Bryan Stevenson, Just Mercy: A Story of Justice and Redemption 18 (paperback ed. 2015).

amici to protect the inmates at OCCC and other State correctional facilities from the lethal threat of the prime COVID-19 habitat in which they are held, as well as to the unilateral sua sponte suspension of HRPP Rules 5 and 10 by the Majority that violates the due process rights of pretrial detainees and exacerbates the overcrowded, cruel and unusual conditions of confinement at OCCC.

DATED:  Honolulu, Hawaiʻi, February 18, 2021.



/s/ Michael D. Wilson

Associate Justice